FILED
United States Court of Appeals
Tenth Circuit

January 20, 2012

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

JOHN DOE,

      Plaintiff - Appellee,

v.

CITY OF ALBUQUERQUE,

      Defendant - Appellant.

No. 10-2102

---

**Appeal from the United States District Court
for the District of New Mexico
(D.C. No. 1:08-CV-01041-MCA-LFG)**

---

Gregory S. Wheeler, Assistant City Attorney for the City of Albuquerque (Robert J. Perry, City Attorney; Peter H. Pierotti, Assistant City Attorney, with him on the brief), Albuquerque, New Mexico, for Defendant-Appellant.

Brendan K. Egan of Rothstein, Donatelli, Hughes, Dahlstrom, Schoenburg & Bienvenu LLP, Santa Fe, New Mexico (Richard W. Hughes of Rothstein, Donatelli, Hughes, Dahlstrom, Schoenburg & Bienvenu LLP, Santa Fe, New Mexico; Laura Schauer Ives, Managing Attorney, ACLU of New Mexico, Albuquerque, New Mexico; Maureen A. Sanders of Sanders & Westbrook, PC, Albuquerque, New Mexico, with him on the brief), for Plaintiff-Appellant.

---

Before **BRISCOE**, Chief Judge, **EBEL** and **O'BRIEN**, Circuit Judges.

---

**EBEL**, Circuit Judge.

This appeal presents us with a difficult issue of first impression. John Doe, a registered sex offender, brought a facial challenge under the First and Fourteenth Amendments to a ban enacted by the City of Albuquerque that prohibited registered sex offenders from entering the City's public libraries. The district court denied a motion to dismiss brought by the City and ultimately granted summary judgment in favor of Doe. The court concluded that the ban burdened Doe's fundamental right to receive information under the First Amendment and that the City failed sufficiently to controvert Doe's contention on summary judgment that the ban did not satisfy the time, place, or manner test applicable to restrictions in a designated public forum. The City appeals both the denial of its motion to dismiss and the grant of Doe's summary judgment motion.

Complicating our inquiry is the fact that the City, relying on a mistaken interpretation of case law regarding facial challenges, erroneously contended that it had no burden to do anything in response to Doe's summary judgment motion. Consequently, the City failed to present any evidence as to the reasons or justification for its ban, whether the ban was narrowly tailored to address the interest sought to be served, or whether the ban left open alternative channels for receiving information. Had the City done so, it is not difficult to imagine that the ban might have survived Doe's challenge, for we recognize the City's significant interest in providing a safe environment for its library patrons, especially children. As an appellate court, however, we are bound by the record and the law. And in this case they require us to affirm the district court.

2

## I. BACKGROUND

### A. Factual Background

Plaintiff-Appellee John Doe[1] is registered with the State of New Mexico as a convicted sex offender. Doe alleges that prior to March 2008, he held a library card from the City of Albuquerque (the "City") and that he "frequently visited the City's public libraries, checked out books, CD's, used other reference material available to him, and attended meetings and lectures." (Aplt. App'x at 3.) However, on March 4, 2008, the City issued a one-paragraph "Administrative Instruction"[2] banning all registered sex offenders from using any of the City's public libraries. The entire text of the Administrative Instruction is set forth below:

> Registered sex offenders are not allowed in public libraries in the City of Albuquerque. This ban includes any person currently registered under the Megan's law of any state, the New Mexico Sex Offender Registration and Notification Act or the Albuquerque Sex Offender Registration and Notification Act. Library staff shall send a letter to every sex offender who has a library card and inform them they are no longer allowed in our libraries. The Albuquerque Police Department, the Bernalillo County Sheriff's Office, the New Mexico State Police and other law enforcement agencies shall enforce this ban.

(Id. at 11.) Pursuant to the ban, Doe received a letter informing him that he was barred from entering the City's public libraries.

---

[1] Doe brought this action under a pseudonym because he fears retaliation.
[2] The parties do not contend that the Administrative Instruction is anything other than the functional equivalent of an ordinance subject to constitutional scrutiny.

## B.  Procedural Background

On October 9, 2008, Doe sued the City in New Mexico state court, asserting, inter alia, causes of action under 42 U.S.C. § 1983 for violation of the right to receive information under the First Amendment and violation of the right to equal protection under the Fourteenth Amendment.[3]  Doe sought a declaration that the ban was unconstitutional and injunctive relief precluding the City from denying him access to the City's public libraries.

On November 6, 2008, the City removed the case to the United States District Court for the District of New Mexico and filed a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure.  The City argued that Doe's complaint failed to state a claim because, inter alia, (1) the City's ban did not implicate a fundamental right; (2) the ban was entitled to a presumption of constitutionality; and (3) the ban was directed only at sex offenders, who as a class do not enjoy the same rights as others.  On September 30, 2009, the district court denied the City's motion to dismiss, concluding that Doe's First Amendment claim stated a plausible claim for relief and that application of rational-basis review did not foreclose Doe's equal protection claim at the pleading stage.

---

[3] Doe also alleged that the ban violated the rights to procedural and substantive due process under the Fourteenth Amendment, various rights under the New Mexico Constitution, and the New Mexico Declaratory Judgment Act.  Doe dismissed his procedural-due-process claims under the U.S. and New Mexico Constitutions on April 10, 2009, and these other remaining claims are not at issue in this appeal.

On May 15, 2009 Doe filed a motion for summary judgment. Doe argued that (1) he had a First Amendment right to receive information at public libraries; (2) public libraries were designated public fora and thus the ban was subject to the time, place, or manner test set forth in Ward v. Rock Against Racism, 491 U.S. 781 (1989) (the "Ward test");[4] and (3) the ban satisfied neither this test nor rational-basis review. In response, the City argued that because Doe was challenging the ban on its face, Doe had to show that the law could not be constitutionally applied under any circumstance, and thus facts related to the passage and purpose of the ban were irrelevant. The City further argued that because the ban was content-neutral, the Ward test did not apply. Accordingly, although the City provided a hypothetical justification for the ban and cursorily asserted that the ban was narrowly tailored, the City did not submit any evidence as to the prongs of the Ward test in opposing Doe's motion.

On March 31, 2010, the district court granted Doe's summary judgment motion. The court determined that because the ban implicated the right to receive information

---

[4] In Ward, the Supreme Court held that "even in a public forum the government may impose reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information." 491 U.S. at 791 (internal quotation marks omitted). Of course, Ward was not the first case to delineate this test for evaluating the constitutionality of time, place, or manner restrictions. See, e.g., Clark v. Cmty. for Creative Non-Violence, 468 U.S. 288, 293 (1984); Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 45 (1983). However, for ease of reference we refer to this test as the "Ward test" in this opinion.

under the First Amendment in a designated public forum, the <u>Ward</u> test applied. The court noted that the City, as the party opposing summary judgment, was required under Federal Rule of Civil Procedure 56 to make an adequate showing on the essential elements of its case on which it had the burden of proof—in this case, the elements of the <u>Ward</u> test. The court determined that the City failed to make this showing because, even assuming the purpose of the ban was to protect children from contact with sex offenders, the City did not demonstrate that the ban was narrowly tailored and that it left open ample alternative channels of communication. The district court further determined that the City failed to show that the ban was sufficiently tailored for the purposes of Doe's equal protection claim. Accordingly, although the court emphasized that it was not recognizing an independent fundamental right of access to a public library, it concluded that the ban, "<u>as currently written and in its present form</u>," was unconstitutional as a matter of law. (Aplt. App'x at 225, 246.)

The City appeals the district court's denial of the City's motion to dismiss and the court's grant of summary judgment in favor of Doe. Exercising our jurisdiction under 28 U.S.C. § 1291, we affirm.[5]

---

[5] **Error! Main Document Only.**After the district court enjoined the City from enforcing its ban, the Mayor issued a revised Instruction permitting registered sex offenders to use the library on Thursdays and Saturdays from 10:00 a.m. to 6:00 p.m. At our request, the parties filed supplemental briefing to address whether the revised Instruction mooted this appeal. Both parties contend this appeal is not moot. In its briefing, the City clearly indicated its intent to reenact the challenged ban should this

Continued . . .

## II. DISCUSSION

### A. The City's motion to dismiss

The City argues that in denying the City's motion to dismiss, the district court

erred by (1) "appl[ying] censorship cases pertaining to the right of the public to receive

information in their homes," (2) "ignor[ing] the presumption of constitutionality that

_____

Court reverse the district court's decision striking it down. The City made clear that it enacted the revised Instruction only to avoid violating the district court order striking down the complete ban. The City intends to reinstate the complete ban if and when the district court's order is vacated.

In light of the City's clearly stated intentions, this case is not moot. For one thing, a party's attempt to comply with a court order does not moot an appeal from that order. See Maher v. Roe, 432 U.S. 464, 468 n.4 (1977) (adoption of a new regulation "only for the purpose of interim compliance with the District Court's judgment and order" did not moot an appeal when the "appeal was taken and submitted on the theory that [the state] desires to reinstate the invalidated regulation"). We also may conclude a case is not moot when "officials who have changed their practices warn that former practices may be resumed at any time." 13C Charles Alan Wright et al., Federal Practice and Procedure § 3533.7 (3d ed. 2008). Finally, a party's vigorous defense of an enjoined law counsels against concluding that a case is moot. See DeJohn v. Temple Univ., 537 F.3d 301, 310 (3d Cir. 2008) (concluding that a case is not moot when a university "defended and continues to defend not only the constitutionality of its prior sexual harassment policy, but also the need for the former policy"); Sasnett v. Litscher, 197 F.3d 290, 291-92 (7th Cir. 1999) ("The state vigorously defends the old regulation . . . [which] implies a high likelihood of returning to the old regulation unless that regulation is enjoined. The probability of such a return is sufficiently high to prevent us from deeming the case moot."), abrogated on other grounds by Bridges v. Gilbert, 557 F.3d 541 (7th Cir. 2009). Here, the City forcefully maintained the constitutionality of the enjoined Instruction while complying with the district court's order in the interim. Given the City's strong indication that it will reenact its prior ban, we are convinced that "granting a present determination of the issues offered . . . will have some effect in the real world." Kan. Judicial Review v. Stout, 562 F.3d 1240, 1246 (10th Cir. 2009) (quoting Citizens for Responsible Gov't State Political Action Comm. v. Davidson, 236 F.3d 1174, 1182 (10th Cir. 2000)).

7

applies to all laws," and (3) "analyz[ing] the case based on the contours of the rights of the general public with no deference to the fact that the ban applied to sex offenders." (Aplt. Br. at 13.)  As discussed below, we reject each of these contentions and affirm the district court's denial of the City's motion to dismiss.

### 1. Standard of Review

"This court reviews the denial of a Rule 12(b)(6) motion to dismiss de novo, applying the same standard as the district court, and accepting the well-pleaded allegations of the complaint as true and construing them in the light most favorable to the [plaintiff]."  Ashley Creek Phosphate Co. v. Chevron USA, Inc., 315 F.3d 1245, 1267 (10th Cir. 2003).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 129 S. Ct. 1937, 1949 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  In other words, the "[f]actual allegations must be enough to raise a right to relief above the speculative level," and a complaint that merely offers "labels and conclusions," or "a formulaic recitation of the elements of a cause of action," is insufficient.  Twombly, 550 U.S. at 555.

### 2. The right to receive information has been recognized in numerous contexts other than "censorship cases," and thus the district court did not err in concluding that Doe sufficiently alleged a violation of this right.

The Supreme Court has repeatedly recognized that the First Amendment includes not just a right of free speech, but also a right to receive information.  See Stanley v.

8

Georgia, 394 U.S. 557, 564 (1969) ("It is now well established that the Constitution protects the right to receive information and ideas. . . . This right to receive information and ideas, regardless of their social worth, is fundamental to our free society." (citation omitted)); Martin v. City of Struthers, 319 U.S. 141, 143 (1943) ("This freedom [of speech and press] embraces the right to distribute literature, and necessarily protects the right to receive it." (citation omitted)); see also Lamont v. Postmaster General, 381 U.S. 301, 308 (1965) (Brennan, J., concurring) ("I think the right to receive publications is . . . a fundamental right. The dissemination of ideas can accomplish nothing if otherwise willing addressees are not free to receive and consider them. It would be a barren marketplace of ideas that had only sellers and no buyers."). Nonetheless, the City contends that the district court erred by relying on Stanley, Martin, and Lamont in determining that Doe's First Amendment claim set forth a plausible claim for relief. Specifically, the City argues that these cases are inapposite because they are "censorship cases" involving the constitutionality of restrictions on "the content of information available to the general public in their homes." (Aplt. Br. at 18-19.) The City thus contends that the district court erred by "plac[ing] the ban under this line of authority." (Id. at 19.)

The City's argument is unavailing for two reasons. First, the district court did not attempt to pigeonhole this case into a "censorship" case or into a case involving the right to receive information in a private home. Rather, the district court simply determined that this authority recognized a general right to receive information under the First

9

Amendment, and that Doe alleged a plausible claim that the City's ban infringed this right. The district court did not err in this reasoning.

Second, the Supreme Court and other courts have widely recognized the right to receive information under the First Amendment in numerous contexts. See First Nat'l Bank v. Bellotti, 435 U.S. 765, 767, 783 (1978) (recognizing right in striking down state statute prohibiting certain corporate election expenditures); Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc., 425 U.S. 748, 749-50, 756-57, 773 (1976) (recognizing right in striking down state statute prohibiting pharmacists from advertising prescription-drug price information); Red Lion Broad. Co. v. FCC, 395 U.S. 367, 375, 390 (1969) (recognizing right in upholding application of fairness doctrine and component regulations); see also Kan. Judicial Review, 519 F.3d at 1111, 1115 (recognizing right in concluding that plaintiff, as a "listener," had standing to challenge Kansas Code of Judicial Conduct Canons prohibiting candidates for judicial office from making certain pledges, commitments, or solicitations of support).

Indeed, in addition to Stanley, Martin, and Lamont, the district court cited circuit and district court cases—including Kreimer v. Bureau of Police, 958 F.2d 1242, 1255 (3d Cir. 1992), Neinast v. Bd. of Trs. of the Columbus Metro. Library, 346 F.3d 585, 591 (6th Cir. 2003), and Armstrong v. D.C. Pub. Library, 154 F. Supp. 2d 67, 75 (D.D.C. 2001)—in which courts have specifically recognized the right to receive information in

10

the context of restrictions involving public libraries.[6] Thus, regardless of the degree to which <u>Stanley</u>, <u>Martin</u>, and <u>Lamont</u> are analogous to the instant case, the district court did not err in concluding that the First Amendment affords a right to receive information, and that Doe sufficiently alleged a violation of this right.

3. <u>The presumption of constitutionality does not apply to the City's ban.</u>

The City is correct that "[a]s a general matter, we give all statutes a presumption of constitutionality and we must apply the same presumption to . . . ordinances." <u>Gillmor</u>

---

[6] Given the role of public libraries in providing a forum for the receipt of information, these courts—and several others—have determined that the First Amendment right to receive information includes the right to some level of access to a public library. <u>See</u> <u>Kreimer</u>, 958 F.2d at 1255 (determining that the right to receive information "includes the right to some level of access to a public library, the quintessential locus of the receipt of information"); <u>Willis v. Town of Marshall</u>, 426 F.3d 251, 260 (4th Cir. 2005) (determining that plaintiff had a First Amendment right to listen to musical performances at town community center, and further noting that this right seemed less compelling than "the right to use a public library"); <u>Neinast</u>, 346 F.3d at 591 (quoting <u>Kreimer</u> in determining that the First Amendment includes the right to some level of access to a public library); <u>Dolan v. Tavares</u>, No. 10-10249-NMG, 2011 U.S. Dist. LEXIS 73601, at *17 (D. Mass. May 16, 2011) ("Access to public libraries implicates the First Amendment."); <u>Hunt v. Wise</u>, No. 8:07-cv-1168-T30TGW, 2009 U.S. Dist. LEXIS 61586, at *13 (M.D. Fla. July 17, 2009) ("Plaintiff had a fundamental right to access the Law Library and receive the information provided therein."); <u>Miller v. Nw. Region Library Bd.</u>, 348 F. Supp. 2d 563, 565-66, 570 (M.D.N.C. 2004) (finding that where plaintiff was banned from using the internet at any regional public library for viewing a pornographic pop-up ad at a library computer, he had "alleged a protected interest affected by the Library's action"); <u>Armstrong</u>, 154 F. Supp. 2d at 75 (recognizing the "long-standing precedent supporting plaintiff's First Amendment right to receive information and ideas, and this right's nexus with access to public libraries"); <u>Sund v. City of Wichita Falls</u>, 121 F. Supp. 2d 530, 547 (N.D. Tex. 2000) ("The right to receive information is vigorously enforced in the context of a public library . . . .").

11

v. Thomas, 490 F.3d 791, 798 (10th Cir. 2007). However, this presumption does not apply when the challenged statute infringes upon First Amendment rights. ACORN v. Municipality of Golden, 744 F.2d 739, 746 (10th Cir. 1984) ("[T]hough duly enacted laws are ordinarily presumed constitutional, when a law infringes on the exercise of First Amendment rights, its proponent bears the burden of establishing its constitutionality."). In his complaint, Doe alleged that the City's ban infringed on his right to receive information under the First Amendment by denying him access to the City's public libraries. As discussed above, the Supreme Court has repeatedly recognized that the First Amendment includes a right to receive information. Therefore, the district court correctly concluded that by alleging that the ban infringed this right, Doe set forth a plausible claim for relief.

As part of its argument regarding the presumption of constitutionality, the City also asserts that the district court failed to observe the "canon of constitutional avoidance," which the City argues "requires a court to avoid striking a law on constitutional grounds when the law is capable of an interpretation that does not trammel upon fundamental rights." (Aplt. Br. at 14-15.) However, "the canon of constitutional avoidance does not apply if a statute is not genuinely susceptible to two constructions." Gonzales v. Carhart, 550 U.S. 124, 154 (2007) (internal quotation marks omitted). The City has not pointed to any alternate construction of the ban that would no longer implicate the First Amendment right to receive information. Indeed, as the City itself concedes, the City's ban is unambiguous—it prohibits "a precisely defined group of

individuals listed on sex offender registries" from accessing the City's public libraries. (Aplt. Br. at 13; see also Aplt. R. Br. at 6 ("The ban is absolute. . . . If a registered sex offender has a fundamental right to enter a public library, then the ban prohibits that conduct in its entirety.").) Accordingly, the canon of constitutional avoidance does not apply to Doe's challenge.

### 4. The fact that courts have upheld restrictions against sex offenders in other contexts does not foreclose Doe's challenge in this case.

Finally, the City argues that the district court erred "by not considering the nature of the problem and the restricted rights of the unique class of offender to which the ban applied." (Aplt. Br. at 18.) Specifically, the City asserts that because of the tendency of sex offenders to reoffend and to commit offenses against children, "the rights of sex offenders are more restricted than other convicted felons." (Id. at 16-17.) The City argues that the district court therefore should have followed the tendency of other courts to "yield to public safety policies aimed at protecting the prospective victims of sex offenders" and dismissed Doe's challenge to the ban at the pleading stage. (Id. at 17.)

To support its argument, the City cites several cases in which courts have upheld laws imposing restrictions against convicted sex offenders. See United States v. Comstock, 130 S. Ct. 1949, 1954, 1956 (2010) (holding that government had authority under the Necessary and Proper Clause to enact federal statute allowing district courts to order civil commitment of certain mentally ill, incarcerated sex offenders); Smith v. Doe, 538 U.S. 84, 89, 105-06 (2003) (holding that the Alaska Sex Offender Registration Act

13

did not violate the Ex Post Facto Clause); Conn. Dep't of Pub. Safety v. Doe, 538 U.S. 1, 4 (2003) (holding that the public disclosure of Connecticut's sex offender registry did not violate the Due Process Clause); Kansas v. Hendricks, 521 U.S. 346, 350, 371 (1997) (holding that statute providing for civil commitment of persons who, due to a "mental abnormality" or a "personality disorder," were likely to engage in "predatory acts of sexual violence," did not violate the Due Process, Double Jeopardy, or Ex Post Facto Clauses); Doe v. Miller, 405 F.3d 700, 704-23 (8th Cir. 2005) (holding that a bill prohibiting sex offenders from residing within 2000 feet of a school or a registered child care facility did not violate the Due Process, Self-Incrimination, or Ex Post Facto Clauses); Standley v. Town of Woodfin, 650 S.E.2d 618, 620-23 (N.C. Ct. App. 2007) (holding that ordinance prohibiting sex offenders from knowingly entering public parks did not violate the Due Process or Ex Post Facto Clauses); State v. Druktenis, 86 P.3d 1050, 1054, 1086 (N.M. Ct. App. 2004) (holding that New Mexico's Sex Offender Registration and Notification Act did not violate the Ex Post Facto, Due Process, or Equal Protection Clauses).

In none of these cases, however, did the reviewing court address whether the challenged statute violated the First Amendment, much less whether a First Amendment claim was subject to dismissal at the pleading stage. The fact that courts have upheld restrictions on sex offenders in other contexts does not compel the conclusion that Doe's challenge in this case necessarily fails to state a claim for relief. Accordingly, the City's argument is unavailing.

14

For these reasons, we affirm the district court's denial of the City's motion to dismiss, and proceed to consider the court's grant of summary judgment in favor of Doe.

### B. Doe's Motion for Summary Judgment

The City argues that the district court erred in concluding that the City had not satisfied its summary judgment burden of showing that its ban was narrowly tailored and left open alternative channels of communication. According to the City, because Doe is challenging the ban on its face, the City has no obligation to make this showing, or indeed to make any showing. Rather, the City argues that the district court was required to ignore all specifically alleged facts and instead attempt to imagine any hypothetical situation in which the ban could be validly applied. Because, according to the City, one can imagine such a hypothetical scenario, the ban must be upheld, and the district court therefore erred in granting summary judgment in favor of Doe.

As discussed below, the City's argument is meritless. The proper framework to apply in a facial challenge is not to require the challenger to disprove every possible hypothetical situation in which the restriction might be validly applied, but rather to apply the appropriate constitutional test to determine whether the challenged restriction is invalid on its face (and thus incapable of any valid application). In this case, we must apply forum analysis to determine the legitimacy of the City's ban. This inquiry indicates that the City's public libraries constitute designated public fora, and therefore that the ban can survive constitutional scrutiny only if the City, as the party with the burden of proof, makes a showing that the ban is narrowly tailored to serve a significant

15

governmental interest and leaves open ample alternative channels of communication. Because the City, apparently as part of its litigation strategy, wholly failed to submit any evidence as to these factors in response to Doe's summary judgment motion, we are bound to affirm.

### 1.    Standard of review

We review the district court's summary judgment order de novo, and apply the same legal standards as the district court. Shero v. City of Grove, 510 F.3d 1196, 1200 (10th Cir. 2007). "Because this case implicates the First Amendment, we have an obligation to make an independent examination of the whole record in order to make sure that the judgment does not constitute a forbidden intrusion on the field of free expression." Golan v. Holder, 609 F.3d 1076, 1082-83 (10th Cir. 2010) (internal quotation marks omitted), aff'd, ---S. Ct.--- (U.S. Jan. 18, 2012) (No. 10-545).

Summary judgment should be granted if there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c)(2) (2009); Fed. R. Civ. P. 56(a) (effective Dec. 1, 2010). "Judgment as a matter of law is appropriate when the nonmoving party has failed to make a sufficient showing on an essential element of his or her case with respect to which he or she has the burden of proof." Shero, 510 F.3d at 1200. When applying this standard, "we view the evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party." Commercial Union Ins. Co. v. Sea Harvest Seafood Co., 251 F.3d 1294, 1298 (10th Cir. 2001).

16

2.     The City's contention that we must examine whether the ban could be validly applied in any hypothetical situation is incorrect.

In United States v. Salerno, the Supreme Court stated, "A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." 481 U.S. 739, 745 (1987). Citing this language, the City argues that in a facial challenge a court must not consider any facts, but instead must simply determine whether it can imagine possible hypothetical situations in which the ban could possibly be constitutionally applied. (See Aplt. Br. at 30 (arguing that the district court was required "to consider any and all possibilities in a manner that construes the law at bar as constitutional if at all possible.").) In fact, the City argues that the Salerno standard renders Federal Rule of Civil Procedure 56 inapplicable to facial challenges because in a facial challenge the government is not required "to controvert facts for trial." (Id. at 21-22.) Accordingly, in this case, the City contends that the district court "erred by holding that the City had to defend against John Doe's motion for summary judgment by demonstrating a factual issue for trial in a case not dependent upon facts." (Id. at 22.) The City argues that there was "no burden upon the City to prove anything," and that the district court instead was required to consider "whether the law could be constitutionally applied to a wealthy sex offender who has access to the other libraries in the City." (Id. at 11, 23.)

17

The City's position underscores the flaws inherent in the so-called "no set of circumstances" test as construed by the City. As discussed below, such an interpretation completely divorces review of the constitutionality of a statute from the terms of the statute itself, and instead improperly requires a court to engage in hypothetical musings about potentially valid applications of the statute. The Supreme Court has repeatedly entertained facial challenges without engaging in this hypothetical exercise. Instead, the Court has properly applied the appropriate constitutional test to the restriction at issue; for example, the Ward test to a content-neutral restriction on free speech rights. Thus, Salerno is correctly understood not as a separate test applicable to facial challenges, but a description of the outcome of a facial challenge in which a statute fails to satisfy the appropriate constitutional framework.

Contrary to the City's position, it has not been established that the "no set of circumstances" test applies to facial challenges not based on overbreadth.[7] The Supreme

---

[7] We agree with the City that Doe's challenge to the ban is not properly characterized as an overbreadth challenge. The Supreme Court has recognized as an "exception from general standing rules" facial challenges in the First Amendment context where the challenger asserts that the restriction is "subject to facial review and invalidation" because it "has the potential to chill the expressive activity of others not before the court." Forsyth Cnty. v. Nationalist Movement, 505 U.S. 123, 129 (1992); see also United States v. Stevens, 130 S. Ct. 1577, 1587 (2010) ("In the First Amendment context . . . this Court recognizes a second type of facial challenge, whereby a law may be invalidated as overbroad if a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." (internal quotation marks omitted)). Although Doe challenges the ban on First Amendment grounds, he argues that the ban does not satisfy the Ward test and therefore cannot be

Continued . . .

18

Court has left this question open, as has the Tenth Circuit. See Stevens, 130 S. Ct. at 1587 ("Which standard applies in a typical case is a matter of dispute that we need not and do not address . . . ."); Hernandez-Carrera v. Carlson, 547 F.3d 1237, 1255 (10th Cir. 2008) ("[W]e have left undecided whether a plaintiff making a facial challenge must establish that no set of circumstances exists under which the Act would be valid . . . ."). Indeed, there is no one test that applies to all facial challenges. In Citizens United v. FEC, the Supreme Court determined that "the distinction between facial and as-applied challenges is not so well defined that it has some automatic effect or that it must always control the pleadings and disposition in every case involving a constitutional challenge." 130 S. Ct. 876, 893 (2010). Instead, the Court concluded that the distinction "goes to the breadth of the remedy employed by the Court, not what must be pleaded in a complaint." Id. Thus, the fact that Doe brings a facial challenge does not automatically compel the application of a specific test, much less the Salerno formulation.

The idea that the Supreme Court applies the "no set of circumstances" test to every facial challenge is simply a fiction, readily dispelled by a plethora of Supreme Court

_____

constitutionally applied at all; he does not contend that the ban has some legitimate sweep that threatens to chill the constitutional expressive activity of others outside of that sweep. Nor could he, for there is no likelihood that non-sex-offenders will be unsure of whether or not the ban applies to them, and thus will refrain from entering the City's libraries. One can readily determine, by resort to objective facts, whether they fall within the scope of the ban or not because the ban is expressly limited to convicted sex offenders. Accordingly, the overbreadth doctrine does not apply here.

19

authority.  Following <u>Salerno</u>, the Court has repeatedly considered facial challenges simply by applying the relevant constitutional test to the challenged statute without attempting to conjure up whether or not there is a hypothetical situation in which application of the statute might be valid.  See, e.g., <u>Brown v. Entm't Merchs. Ass'n</u>, 131 S. Ct. 2729, 2738, 2742 (2011) (applying strict scrutiny in concluding that statute prohibiting the sale or rental of "violent video games" to minors violated the First Amendment); <u>Citizens United</u>, 130 S. Ct. at 898, 903-11, 913 (applying strict scrutiny in striking down, under the First Amendment, provision of the Bipartisan Campaign Reform Act of 2002 ("BCRA") barring corporation-funded "electioneering communications"); <u>Davis v. FEC</u>, 554 U.S. 724, 729, 736-37, 740-44 (2008) (applying heightened scrutiny in striking down on First Amendment grounds provision of BCRA providing for asymmetrical campaign contribution standards); <u>Hill v. Colorado</u>, 530 U.S. 703, 707, 725-30 (2000) (applying <u>Ward</u> test in upholding statute prohibiting certain speech-related conduct within 100 feet of the entrance to any healthcare facility); <u>Santa Fe Indep. Sch. Dist. v. Doe</u>, 530 U.S. 290, 301, 313-16 (2000) (applying the test set forth in <u>Lemon v. Kurtzman</u>, 403 U.S. 602 (1971), in concluding that school district's policy of permitting student-led, student-initiated prayer at football games violated the First Amendment's Establishment Clause); <u>United States v. Playboy Entm't Grp., Inc.</u>, 529 U.S. 803, 806-07, 813 (2000) (applying strict scrutiny in striking down a statute requiring cable television operators who provided adult-oriented programming to fully scramble or block those channels between 10 p.m. and 6 a.m.); <u>Nat'l Endowment for the Arts v. Finley</u>, 524 U.S.

20

569, 572-73, 585 (1998) (noting that even though statute providing for NEA funding could be constitutionally applied in certain situations, "these permissible applications would not alone be sufficient to sustain the statute against respondents' First Amendment challenge," --- thereby directly contradicting the "no set of circumstances" test); <u>Planned Parenthood v. Casey</u>, 505 U.S. 833, 869-901 (1992) (upholding certain provisions of a Pennsylvania abortion statute and striking down the spousal-notification provision without applying <u>Salerno</u>); <u>Burson v. Freeman</u>, 504 U.S. 191, 193-94, 198, 211 (1992) (applying strict scrutiny in upholding Tennessee statute prohibiting the solicitation of votes and the display or distribution of campaign materials within 100 feet of the entrance to a polling place); <u>Bowen v. Kendrick</u>, 487 U.S. 589, 593, 602 (1988) (applying <u>Lemon</u> test in upholding, on its face, a federal grant program that provided for the involvement of religious organizations in funding services related to adolescent sexuality and pregnancy); <u>Frisby v. Schultz</u>, 487 U.S. 474, 476, 481-88 (1988) (applying <u>Ward</u> test in upholding town ordinance banning picketing "before or about" any residence); <u>Edwards v. Aguillard</u>, 482 U.S. 578, 580-83 (1987) (applying <u>Lemon</u> test in invalidating Louisiana statute prohibiting the teaching of evolution in public schools unless accompanied by instruction in "creation science").[8]

---

[8] In the cases cited above in which the Court held that the challenged restriction was invalid, it is clear that had the Court actually applied the "no set of circumstances" test, it would have been required to reach the opposite conclusion. For example, in <u>Brown</u>, the Court determined that the evidence offered by California did not prove that

Continued . . .

Indeed, in <u>City of Chicago v. Morales</u>, a plurality of the Court asserted that "[t]o the extent we have consistently articulated a clear standard for facial challenges, it is not

_____

violent video games actually caused minors to act aggressively, and thus the statute did not survive strict scrutiny. 131 S. Ct. at 2739. However, under the <u>Salerno</u> test advocated by the City, the Court would have <u>had to assume</u> that violent video games cause minors (or at least one hypothetical minor) to react violently, and thus that California had a compelling interest in banning the sale or rental of such games. Similarly, in <u>Citizens United</u>, the government argued that the corporate political speech at issue could be barred in order to prevent corruption or the appearance of corruption. 130 S. Ct. at 908. The Court rejected this argument, concluding that "independent expenditures, including those made by corporations, do not give rise to corruption or the appearance of corruption." <u>Id.</u> at 909. Under the "no set of circumstances" test, however, the Court would have had to assume that such expenditures <u>do</u> give rise to corruption or the appearance of corruption because one could easily imagine a scenario where such expenditures did lead to corruption. This would, in turn, give rise to a valid application of the statute, and therefore would preclude the facial invalidation of the statute under <u>Salerno</u>.

In <u>Santa Fe</u>, the challenged policy clearly provided for the possibility that students would elect not to offer an invocation or would elect to offer a nonsectarian message before football games. 530 U.S. at 313-17. Under the <u>Salerno</u> test advocated by the City, the Court would have to uphold the law based on this conceivably valid application. In <u>Playboy</u>, the Court concluded that an alternative statute—which required operators to block undesired channels at individual households upon request—was a less restrictive alternative and was effective to serve the government's interest in shielding children from offensive "signal bleed." 529 U.S. at 824-27. The "no set of circumstances" test, however, would have required the Court to assume that the alternative statute was not effective to block signal bleed at least in some situations, and thus would have dictated that the statute be upheld based on the presumably valid applications in these situations. And in <u>Casey</u>, the Court found the "vast majority" of married women already notify their spouses of their decision to obtain an abortion. 505 U.S. at 888-92. Moreover, the Court found that even with respect to the small minority of married women who do not wish to inform their husbands of their intentions, the restriction would operate as a substantial obstacle in a "large fraction of cases"; the Court did not find that this obstacle would be present in every case. <u>Id.</u> at 893-95. The Court's decision nonetheless to strike down the spousal-notification provision thus directly contradicts the "no set of circumstances" test.

22

the Salerno formulation, which has never been the decisive factor in any decision of this Court, including Salerno itself." 527 U.S. 41, 55 n.22 (1999) (plurality opinion); see also Washington v. Glucksberg, 521 U.S. 702, 739-40 (1997) (Stevens, J., concurring) (criticizing the strictness of Salerno and noting the debate over the appropriate standard); Janklow v. Planned Parenthood, Sioux Falls Clinic, 517 U.S. 1174, 1175 (1996) (Stevens, J., respecting denial of cert.) ("Salerno's rigid and unwise dictum has been properly ignored in subsequent cases even outside the abortion context."); United States v. Castillo, 140 F.3d 874, 879 n.3 (10th Cir. 1998) (noting that "there has been some debate over the continued vitality of Salerno" and that "the Supreme Court may have overruled it, at least in some contexts"); Sonnier v. Crain, 613 F.3d 436, 463-64 (5th Cir. 2010) (Dennis, J., dissenting) (arguing that the "no set of circumstances" language from Salerno constituted "nothing more than a controversial dictum" and noting that "diligent research" had failed to turn up "a single Supreme Court case—including Salerno itself— in which the holding actually relied on the 'no set of circumstances' test"), reiterated on reh'g, 634 F.3d 778, 779 (5th Cir. 2011) (Dennis, J., dissenting).

The City relies primarily on Washington State Grange v. Washington State Republican Party, 552 U.S. 442 (2008), to support its contention that the "no set of circumstances" test applies to all facial challenges. In that case, the Court cited the Salerno test in rejecting a facial pre-enforcement challenge to a state initiative that provided, inter alia, that candidates for office be identified on the ballot by self-designated "party preference." 552 U.S. at 444, 449. However, the Court did so in the

23

course of applying the relevant constitutional test. Specifically, in Grange, the Washington State Republican Party ("WSRP") contended that the initiative violated its associational rights "by usurping its right to nominate its own candidates and by forcing it to associate with candidates it [did] not endorse." Id. at 448. The Court determined that the proper test to apply depended on how significantly the initiative burdened the associational rights at issue: If the burden was severe, strict scrutiny applied; if the burden was modest, a reasonableness standard applied. Id. at 451-52.

The WSRP contended that the initiative severely burdened its associational rights because voters would assume that candidates on the ballot were the nominees of their self-designated preferred parties. Id. at 454. The Court rejected this argument, determining that it rested on "sheer speculation." Id. The Court added that if it were to speculate on the form of the ballot, it could conceive of a ballot that would eliminate the possibility of widespread voter confusion. Id. at 455-56. Thus, the Court concluded that the WSRP could not establish that voters would be confused, and therefore that the initiative did not facially impose a severe burden on WSRP's associational rights. Id. at 457-58. The Court made clear that "[i]n determining whether a law is facially invalid, we must be careful not to go beyond the statute's facial requirements and speculate about 'hypothetical' or 'imaginary' cases." Id. at 449-50 (emphasis added). The Court further

24

noted the criticism of <u>Salerno</u> and indicated that it was not relying on this test. <u>Id.</u> at 449.[9]

Thus, <u>Grange</u> merely supports the approach to facial challenges which involves an examination of whether the terms of the statute itself "measured against the relevant constitutional doctrine, and independent of the constitutionality of particular applications, contain[] a constitutional infirmity that invalidates the statute in its entirety." Marc E. Isserles, <u>Overcoming Overbreadth: Facial Challenges and the Valid Rule Requirement</u>, 48 AM. U. L. REV. 359, 387 (1998). Indeed, a facial challenge is just that—a challenge to the terms of the statute, not hypothetical applications. <u>Salerno</u>'s language thus is accurately understood not as setting forth a <u>test</u> for facial challenges, but rather as describing the <u>result</u> of a facial challenge in which a statute fails to satisfy the appropriate constitutional standard. In other words, where a statute fails the relevant constitutional test (such as strict scrutiny, the <u>Ward</u> test, or reasonableness review), it can no longer be constitutionally applied to anyone—and thus there is "no set of circumstances" in which the statute would be valid. The relevant constitutional test, however, remains the proper inquiry.[10] <u>See, e.g.</u>, <u>Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.</u>, 508 U.S.

---

[9] Specifically, the Court concluded that the initiative would survive either under the "no set of circumstances" test or an alternate test that looks to whether the initiative has a "'plainly legitimate sweep.'" 552 U.S. at 449 (quoting <u>Glucksberg</u>, 521 U.S. at 739-740, & n.7 (Stevens, J., concurring in judgments)).

[10] At oral argument, the parties discussed whether our decision in <u>United States v. Reese</u>, 627 F.3d 792 (10th Cir. 2010), <u>cert denied</u>, 131 S. Ct. 2476 (2011), affected Doe's

Continued . . .

25

384, 393 n.6 (1993) ("If [the challenged restriction] were to be held unreasonable, it could be held facially invalid, that is, it might be held that the rule could in no circumstances be applied to religious speech or religious communicative conduct."); Ezell v. City of Chicago, 651 F.3d 684, 698-99 (7th Cir. 2011) ("In a facial challenge like this one, the claimed constitutional violation inheres in the terms of the statute, not its application. . . . [A] successful facial attack means the statute is wholly invalid and cannot be applied to anyone. Chicago's law, if unconstitutional, is unconstitutional without regard to its application—or in all its applications, as Salerno requires."); Rothe Dev. Corp. v. Dep't of Defense, 413 F.3d 1327, 1337-38 (Fed. Cir. 2005) ("Salerno is of limited relevance here, at most describing a conclusion that could result from the application of the strict scrutiny test."); Isserles, 48 AM. U. L. REV. at 364 ("Salerno's 'no set of circumstances' is not a 'test' that prescribes an application-specific method of

_____

challenge here. However, Reese involved an as-applied challenge and, in any event, in that case we simply proceeded as described above: we applied the relevant constitutional test. Specifically, the defendant in Reese raised a Second Amendment, as-applied challenge to 18 U.S.C. § 922(g)(8), which, inter alia, prohibits the possession of firearms by someone who is subject to a domestic protection order. 627 F.3d at 794. We determined that the defendant's challenge should be reviewed under intermediate scrutiny—specifically, that "the government has the burden of demonstrating that its objective is an important one and that its objective is advanced by means substantially related to that objective." Id. at 802 (internal quotation marks omitted). We concluded that the statue satisfied the test. Id. at 802-05. Thus, Reese does not compel any conclusion in Doe's case. The outcome in Reese depended on our evaluation of the government's interest and whether the challenged statute advanced that interest, just as the outcome here depends on an assessment of the relationship between the City's interest and the ban under the relevant constitutional test. See infra Part II.B.4.

26

determining constitutional invalidity, but rather a descriptive claim about a statute whose terms state an invalid rule of law.").

We therefore consider Doe's facial challenge to the City's ban by resort to the applicable constitutional framework—in this case, forum analysis.

### 3. The City's public libraries are designated public fora.

As discussed above, the First Amendment includes a fundamental right to receive information. By prohibiting registered sex offenders from accessing the City's public libraries, the City's ban precludes these individuals from exercising this right in a particular government forum. In order to determine whether the ban runs afoul of the First Amendment, then, we must examine the nature of the forum at issue. See Cornelius v. NAACP Legal Def. & Educ. Fund, Inc., 473 U.S. 788, 800 (1985) ("[T]he extent to which the Government can control access depends on the nature of the relevant forum."); Perry, 460 U.S. at 44 ("The existence of a right of access to public property and the standard by which limitations upon such a right must be evaluated differ depending on the character of the property at issue.").

In Perry, the Supreme Court identified three categories of government property: (1) traditional public fora ("streets and parks which have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions"); (2) designated public fora ("public property which the State has opened for use by the public as a place for expressive activity"); and (3) nonpublic fora ("[p]ublic property

27

which is not by tradition or designation a forum for public communication"). 460 U.S. at 45-46 (internal quotation marks omitted). The Court has since identified a separate category—the "limited public forum"—although the Court's use of this term has been inconsistent. See Summum v. Callaghan, 130 F.3d 906, 914-16 (10th Cir. 1997) (describing inconsistent use of the term by the Supreme Court). Both the Supreme Court and the Tenth Circuit have made clear, however, that a "designated public forum" and a "limited public forum" are distinct categories and subject to different standards in evaluating governmental restrictions on speech in these fora. See Christian Legal Soc'y Chapter of the Univ. of Cal., Hastings Coll. of Law v. Martinez, 130 S. Ct. 2971, 2984 n.11 (2010) ("[G]overnmental entities create designated public forums when 'government property that has not traditionally been regarded as a public forum is intentionally opened up for that purpose[.]' . . . [G]overnmental entities establish limited public forums by opening property 'limited to use by certain groups or dedicated solely to the discussion of certain subjects.'" (quoting Pleasant Grove City v. Summum, 555 U.S. 460, 469-70 (2009)); Shero, 510 F.3d at 1202 (describing the distinction between the two categories); Callaghan, 130 F.3d at 916 n.14 ("[A] designated public forum for a limited purpose and a limited public forum are not interchangeable terms.").

We previously have identified public libraries as a type of designated public forum. Hawkins v. City & Cnty. of Denver, 170 F.3d 1281, 1287 (10th Cir. 1999) ("Examples of designated public fora include: . . . public libraries . . . ."). Although this pronouncement was dicta, we reaffirm it here. As Perry counsels, a designated public

28

forum is "public property which the State has opened for use by the public as a place for expressive activity." 460 U.S. at 45. Public libraries are opened for particular forms of expressive activity, including receiving information and "reading, writing or quiet contemplation." Kreimer, 958 F.2d at 1264. While public libraries are not designated for other First Amendment activities, such as speeches or debate, this limitation on the types of First Amendment activity permitted does not preclude a library from constituting a designated public forum. See Cornelius, 473 U.S. at 802 ("[A] public forum may be created by government designation of a place . . . for use by the public at large for assembly and speech, for use by certain speakers, or for the discussion of certain subjects."); Church on the Rock v. City of Albuquerque, 84 F.3d 1273, 1278 (10th Cir. 1996) ("[D]esignated public forums may be limited in terms of participants and in terms of subject matter.").

The City, however, argues that public libraries constitute "limited public fora."[11] "We recognize that the boundary between a designated public forum for a limited purpose . . . and a limited public forum . . . is far from clear." Callaghan, 130 F.3d at 916 n.14. However, in Callaghan, we identified three non-exhaustive factors to consider in

_____

[11] Neither party contends that public libraries constitute either "traditional public fora" or "nonpublic fora." We agree, as public libraries are not analogous to "streets and parks which have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions" or "[p]ublic property which is not by tradition or designation a forum for public communication." Perry, 460 U.S. at 45-46.

29

determining whether the government has created a designated public forum: "(1) the purpose of the forum; (2) the extent of use of the forum; and (3) the government's intent in creating a designated public forum." Id. at 915. These factors support our conclusion that a library constitutes a designated public forum.

With respect to the first factor, the "very purpose" of a public library "is to aid in the acquisition of knowledge through reading, writing, and quiet contemplation." Kreimer, 958 F.2d at 1261; see also id. at 1255 (describing a public library as "the quintessential locus of the receipt of information"). It is "a place dedicated to quiet, to knowledge, and to beauty." Brown v. Louisiana, 383 U.S. 131, 142 (1966). That the government opens up a library to the public to engage in myriad ways to receive information suggests that a library constitutes a designated public forum.

With respect to the extent of use of the forum, in Callaghan we noted that, in order to find a designated public forum, the government "must allow general access to, or indiscriminate use of, the forum in question whether by the general public, certain speakers, or for certain subjects." 130 F.3d at 915 n.13 (emphasis added) (internal citations and quotation marks omitted); see also Ark. Educ. Television Comm'n v. Forbes, 523 U.S. 666, 679 (1998) (noting "the distinction between general access, which indicates the property is a designated public forum, and selective access, which indicates the property is a nonpublic forum" (internal citations and quotation marks omitted)); Alpha Delta Chi-Delta Chapter v. Reed, 648 F.3d 790, 798 (9th Cir. 2011) (noting that requirement that student groups obtain university approval before accessing the forum at

30

issue "is further indication that the student organization programs are limited public forums"), petition for cert. filed (U.S. Dec. 14, 2011) (No. 11-744, 11A349). The City does not contend that its public libraries offer anything less than general access to the public, without any need for pre-approval. Accordingly, this factor indicates that the City's libraries are designated public fora.[12]

Finally, there is no evidence in the record that the City's intent in creating its libraries was anything other than to provide a forum for all of the City's residents to engage in the receipt of information. We therefore conclude that the City's public libraries constitute designated public fora.

Our conclusion is in accord with those courts that have considered the categorization of public libraries for the purpose of forum analysis. In Kreimer, the case upon which we relied in Hawkins, 170 F.3d at 1287, the Third Circuit considered whether the public library at issue constituted a traditional public forum, a designated

---

[12] Indeed, public libraries provide far greater public access than those fora that the Supreme Court has recognized as limited public fora, such as a registered student organization program available to university student groups upon the satisfaction of certain conditions, see Martinez, 130 S. Ct. at 2979, 2984 & n.12, and a university's student activities fund, see Rosenberger v. Rector & Visitors of the Univ. of Va., 515 U.S. 819, 824, 829-30 (1995). Indeed, a public library also appears to provide greater public access than other fora recognized as designated public fora. See Hawkins, 170 F.3d at 1287 (citing, as examples of designated public fora recognized by the Supreme Court and circuit courts, "state university meeting facilities expressly made available for use by students," "school board meetings open to the public by state statute," "advertising space in state-owned subway and commuter rail stations," and "a city owned and operated senior center sponsoring lectures").

31

public forum, or a nonpublic forum. 958 F.2d at 1255-62. The court considered the government's intent in opening the public library, the extent of use of the library, and the nature of the library, and concluded that the library constituted "a limited public forum, a type of designated public fora." Id. at 1259-61. Later courts, citing Kreimer, have reached the same conclusion. See, e.g., Neinast, 346 F.3d at 591; Armstrong, 154 F. Supp. 2d at 75; Sund, 121 F. Supp. 2d at 548; Mainstream Loudoun v. Bd. of Trs. of Loudon Cnty. Library, 24 F. Supp. 2d 552, 563 (E.D. Va. 1998). Although many of these courts used the term "limited public forum," they each applied the standard applicable to designated public fora in reviewing regulations that restricted permitted expressive activity (reading, writing, and quiet contemplation) in the library. See Neinast, 346 F.3d at 591; Armstrong, 154 F. Supp. 2d at 75-76; Sund, 121 F. Supp. 2d at 548; Mainstream Loudoun, 24 F. Supp. 2d at 563. Indeed, these courts each relied on Kreimer, which used the term "limited public forum" to denote a "sub-category of designated public fora." See 958 F.2d at 1261. Thus, these courts did not apply the reasonableness standard applicable to "limited public fora," as that term has now been defined, but in fact used the analysis appropriate to a designated public fora. The confusion in terminology can be explained by the general confusion in terminology among many courts as the Supreme Court has only recently clarified the terminology of "designated" and "limited" public fora. See Martinez, 130 S. Ct. at 2984 n. 11; Pleasant Grove, 555 U.S. at 469-70.

32

4. The City has failed to meet its summary judgment burden.

Once a court identifies the nature of the forum, "the court must assess whether the justifications for exclusion from the relevant forum satisfy the requisite standard." Wells v. City & Cnty. of Denver, 257 F.3d 1132, 1139 (10th Cir. 2001) (internal quotation marks omitted). "In a designated public forum, the government may only impose content-neutral time, place, and manner restrictions that: (a) serve a significant government interest; (b) are narrowly tailored to advance that interest; and (c) leave open ample alternative channels of communication." Shero, 510 F.3d at 1203 (internal quotation marks omitted); see also Ward, 491 U.S. at 791 (setting forth test). The City has the burden of proof in this inquiry. See Playboy, 529 U.S. at 816 ("When the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions."); Turner Broad. Sys., Inc. v. FCC, 512 U.S. 622, 664 (1994) ("When the Government defends a regulation on speech as a means to redress past harms or prevent anticipated harms, it must do more than simply posit the existence of the disease sought to be cured. It must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." (internal citation and quotation marks omitted)); ACORN, 744 F.2d at 746 ("[T]hough duly enacted laws are ordinarily presumed constitutional, when a law

33

infringes on the exercise of First Amendment rights, its proponent bears the burden of establishing its constitutionality.").[13]

Both parties agree that the City's ban is content-neutral. In his summary judgment motion, however, Doe argued that the ban did not satisfy the other elements of the Ward test. Thus, the relevant inquiry is whether the City, as the non-moving party with the burden of proof on this dispositive issue, has met its burden of showing that the ban satisfies these prongs.

Because the City argued that there was "no burden upon the City to prove anything," it did not submit any evidence as to the Ward factors in opposing Doe's summary judgment motion. (Aplt. Br. at 23.) The City continues to assert this position on appeal, contending that because a facial challenge is a "purely legal inquiry" in which "factual issues have no bearing," the district court "erred by holding that the City had to defend against John Doe's motion for summary judgment by demonstrating a factual issue for trial in a case not dependent upon facts." (Id. at 6, 22.) As discussed below, the City's refusal to provide any evidence in response to Doe's summary judgment motion ultimately dooms its ban as a matter of law.

---

[13] This is another reason for rejecting the City's interpretation of Salerno, under which the City argues that there is "no burden upon the City to prove anything." (Aplt. Br. at 23.) The City's position would require placing the burden of proof on the person whose First Amendment rights are infringed by a statute rather than on the government.

a)      Although the City provided no justification or reasons for its ban, we can discern the interest to be served by the ban from its text.

The City concedes that it did not offer any reasons or justification for why it enacted the ban in the first place, either in the text of the ban itself or in opposing Doe's summary judgment motion.[14] Rather, in its opposition brief, the City asserted that "[t]he motivation for the ban is immaterial under the rubric of a facial challenge." (Aplt. App'x at 126.) The only statement as to the reasons for the ban offered by the City in response to Doe's summary judgment motion was a hypothetical:

> Because Plaintiff questions the necessity of the ban based on facts not in issue and because the standard is whether the ban is constitutional in any hypothetical situation, to the extent the Court questions the impetus for the ban, the Court could assume, hypothetically, that the following occurred: The City entered into an agreement with schools near libraries so children can go to libraries after school and study. Shortly after the City entered this

---

[14] At oral argument, the City answered questions on this point as follows:

CHIEF JUDGE BRISCOE: "Does the City have any burden here to justify the imposition of this restriction; that is, the rationale that supports the imposition of the ban?"
CITY ATTORNEY: "No, Your Honor, we do not."
. . . .
 CHIEF JUDGE BRISCOE: "And in response to the facial challenge by the plaintiff here, did the City provide any . . . studies, or any type of evidence to justify the ban?"
CITY ATTORNEY: "No, Your Honor, because we didn't want to waive our presumptions of constitutionality."

(Oral arg. tr. at :54-1:07; 7:43-8:00.)  As discussed above, the presumption of constitutionality does not apply to the City's ban because the ban infringes upon First Amendment rights.  (See supra Part II.A.3).

35

agreement with the schools, the attendance of young teens increased substantially between approximately 3:00 p.m. and 5:00 p.m. on weekdays in City libraries. The City noticed an increase in adult male presence in libraries in the same time frame. The police began an undercover operation regarding a notorious sex offender who preys on young teens and found that this sex offender and other "preferential" sex offenders, who also prey on young teens, were frequenting the libraries at a dramatically increased rate on weekdays between 3:00 p.m. and 5:00 p.m. On January 31, 2008, newspapers reported that registered sex offender Corey Saunders raped a six year old in a New Bedford, Connecticut public library. On March 4, 2008, the Mayor of Albuquerque banned all registered sex offenders from City libraries.

(Id. at 126 n.1.) The City, however, did not cite to any evidence to support this hypothetical.

The City's position runs afoul of the numerous cases indicating that, in reviewing the constitutionality of a restriction or policy, a court must consider the government interest sought to be advanced. See, e.g., Santa Fe Indep. Sch. Dist., 530 U.S. at 315 (stating that the Court's inquiry into the constitutionality of the school district's policy "not only can, but must, include an examination of the circumstances surrounding its enactment"); Turner Broad. Sys., 512 U.S. at 664 ("When the Government defends a regulation on speech as a means to redress past harms or prevent anticipated harms, it must do more than simply posit the existence of the disease sought to be cured. It must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." (internal citation and

36

quotation marks omitted)).[15]  Indeed, only by discerning the interest to be served by a

restriction can a court proceed to determine whether the restriction is sufficiently tailored

to advance that interest.

The illogic in the City's position is underscored by its assertion at oral argument,

in response to the panel's point that the ban applied not only to sex offenders convicted of

crimes involving children but also to sex offenders convicted of crimes involving adults,

that the ban was also enacted to protect "adult females."  (Oral arg. tr. at 5:05-:46.)  This

assertion is completely unsupported by the record, and finds no support even in the City's

hypothetical.  This begs the question of how a reviewing court is supposed to discern the

interest to be served by a restriction in the absence of any evidence.  The City's ad hoc

attempts to provide a reason for the ban and its invitation to the Court to imagine

hypothetical justifications obfuscates our ability to determine the interest to be served by

the ban.

Nevertheless, in this case we can discern the justification for the ban in the terms

of the ordinance itself.  See Turner Broad. Sys., 512 U.S. at 642 ("The purpose, or

justification, of a regulation will often be evident on its face.").  By prohibiting registered

_____

[15] Of course, in the cases discussed supra in Part II.B.2 in which the Court applied strict scrutiny or the Ward test in considering a facial challenge—including Brown, Citizens United, Hill, Playboy, Burson, Frisby, and Ward itself—the Supreme Court had to consider the interest to be served by the restriction in order to determine whether the restriction was appropriately tailored to advance that interest.  If the City's view were correct, then the Court erred in each of these cases by looking at the government's justification for the restriction at issue.

sex offenders from entering the City's public libraries, it is evident that the ban seeks to provide a safe environment for library patrons, including children.  And in his summary judgment motion, Doe conceded, as he must, that "the City's interest in protecting children from any danger, including crimes containing a sexual element, is a significant one for purposes of this constitutional analysis." (Aplt. App'x at 74.)  See, e.g., New York v. Ferber, 458 U.S. 747, 757 (1982) ("The prevention of sexual exploitation and abuse of children constitutes a government objective of surpassing importance."); Weems v. Little Rock Police Dep't, 453 F.3d 1010, 1019 (8th Cir. 2006) ("The State has a strong interest in the protection of children from sex offenders who are likely to recidivate . . . .").  We thus consider whether the City has made a showing the ban is narrowly tailored to serve this significant interest.

     b)  The City has not shown that the ban is narrowly tailored.

Although a time, place, or manner restriction must be narrowly tailored to serve a significant governmental interest, "it need not be the least restrictive or least intrusive means of doing so."  Ward, 491 U.S. at 798.  "Rather, the requirement of narrow tailoring is satisfied so long as the . . . regulation promotes a substantial government interest that would be achieved less effectively absent the regulation" without "burden[ing] substantially more speech than is necessary to further the government's legitimate interests."  Id. at 799 (internal quotation marks omitted).  The burden is on the government to show that its regulation is narrowly tailored.  See Playboy, 529 U.S. at

38

816; ACORN, 744 F.2d at 746; Citizens for Peace in Space v. City of Colorado Springs, 477 F.3d 1212, 1220 (10th Cir. 2007) ("[T]he government must demonstrate that the restriction serve[s] a substantial state interest in a direct and effective way." (internal quotation marks omitted)); Deegan v. City of Ithaca, 444 F.3d 135, 142 (2d Cir. 2006) ("In a First Amendment challenge, the government bears the burden of showing that its restriction of speech is justified under the traditional 'narrowly tailored' test.  The entity that enacted a challenged regulation has the burden to demonstrate that the interest served justifies the restriction imposed." (internal quotation marks and citation omitted)); Hays Cnty. Guardian v. Supple, 969 F.2d 111, 119 (5th Cir. 1992) ("[T]he burden is on defendants to show affirmatively that their restriction is narrowly tailored to protect the identified interests.").

In response to Doe's summary judgment motion, the City did not present any evidence that its ban was narrowly tailored to serve its interest in providing a safe environment for library patrons.  Instead, the City pointed to other cases in which courts have found challenged restrictions on sex offenders to be narrowly tailored.  (Aplt. App'x at 143-44 (citing Miller, 405 F.3d 700; Doe v. City of Lafayette, 377 F.3d 757 (7th Cir. 2004); Standley, 650 S.E.2d 618; Druktenis, 86 P.3d 1050).)  But whether the restrictions at issue in those cases were narrowly tailored in the respective contexts of those cases does not compel any conclusion as to the City's ban in this case.  Indeed, none of the cases cited by the City applied a narrowly-tailored inquiry in the context of a First Amendment claim, and thus none evaluated whether the restriction at issue burdened

39

substantially more speech than necessary to further the government's interest. General reference to other cases involving other cities, other restrictions, other interests to be served, and other constitutional challenges do not relieve the City's burden in this case.

We do not quarrel with the general proposition, recognized by courts in other cases, that sex offenders statistically have a significant rate of recidivism and therefore may present a risk of danger to those around them. See, e.g., Smith, 538 U.S. at 103 (noting "grave concerns over the high rate of recidivism among convicted sex offenders and their dangerousness as a class"); Conn. Dep't of Pub. Safety, 538 U.S. at 4 ("Sex offenders are a serious threat in this Nation. The victims of sex assault are most often juveniles, and when convicted sex offenders reenter society, they are much more likely than any other type of offender to be re-arrested for a new rape or sex assault." (internal quotation marks and citations omitted)). Given this concern, it is evident that the City's interest in providing a safe environment in its libraries would be achieved less effectively without the ban; the presence of sex offenders alone may pose a threat to other library patrons. The critical question, however, is whether the wholesale ban on any and all access to public libraries "burden[s] substantially more speech than is necessary to further the government's legitimate interests." Ward, 491 U.S. at 799.

The City provided nothing in the record that could satisfy its obligation of proving that the ban is narrowly tailored. Although the City does not need to prove that its ban is the least restrictive approach to address its concern, it still must show that it is not substantially more restrictive than necessary to meet the City's objectives. Other

40

possible, less restrictive approaches potentially suggest themselves, such as establishing designated hours during which sex offenders are permitted to use the libraries, requiring sex offenders to check into the libraries, or designating certain areas of the libraries for use by registered sex offenders. Since we are speculating, in part, on precisely what the City's justification or reason for the ban was, we would be pushed into speculation upon speculation as to whether to conclude that the City has met its burden of proving that the ban is narrowly tailored.

        c)      By not making any showing as to alternative channels of communication, the City failed to meet its Rule 56 burden in responding to Doe's motion.

The City's failure to satisfy its obligations under the three prong Ward test is in sharpest relief on the third prong requiring the City to show that the aggrieved group has adequate alternative channels of receiving the speech that the ban prevents them from receiving via the library. In response to Doe's summary judgment motion, the City did not provide any evidence as to possible alternative channels of receiving information in the City by convicted sex offenders.[16][17] Relying on its position that a court must make

---

[16] The City contended that "[u]ndisputed material facts are not in issue in a facial challenge," but offered the following facts "to the extent [Doe's] reliance on specific facts as a background for the Court could be of some assistance, or the Court elects to entertain an as-applied challenge": (1) Doe "does not utilize University of New Mexico libraries in Albuquerque"; and (2) Doe "knows that Central New Mexico Community College has a library in the City, but [Doe] does not utilize that library." (Aplt. App'x at 126-27 (citing testimony from Doe's deposition).) These contentions do not address

Continued . . .

41

hypothetical assumptions in the City's favor in a facial challenge, the City argues that it did not need to present any evidence on alternative channels because "[t]he lower court should have assumed there are alternative sources of information in Albuquerque available to registered sex offenders." (Aplt. Br. at 7.) The City's aggressive litigation position ultimately requires affirmance in this case.

The City has the burden of showing that its ban leaves ample alternative channels of communication. See Seung Chun Lim v. City of Long Beach, 217 F.3d 1050, 1054 (9th Cir. 2000) ("[I]t is clear that the burden of proving alternative avenues of communication rests on [the city]."); see also Playboy, 529 U.S. at 816 ("When the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions."); ACORN, 744 F.2d at 746 ("[W]hen a law infringes on the exercise of First Amendment rights, its proponent bears the burden of establishing its constitutionality."). "[W]here the nonmoving party will bear the burden of proof at trial

_____

whether or to what extent other libraries may constitute alternative channels for receiving information by convicted sex offenders--particularly those offenders without an affiliation with Central New Mexico Community College or the University of New Mexico.

[17] Because Doe challenges the ban on its face, we agree with the City that the district court erred by relying on Doe's individual circumstances in evaluating whether there were adequate alternative channels of communication. However, as the non-moving party that bore the burden of proof, the City was required to make a showing as to alternative channels of communication generally to those whose access to speech is restricted by this regulation.

42

on a dispositive issue," Federal Rule of Civil Procedure 56 "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986) (internal quotation marks omitted).

> d) Conclusion as to the three prong time, place and manner test of Ward.

Because the City totally failed to show that its ban was narrowly tailored and that it leaves open ample alternative channels of communication, we thus must conclude as a matter of law on the face of the record before us that the City's ban does not constitute a permissible time, place, or manner restriction under the Ward test. Accordingly, we are bound to affirm the district court's grant of summary judgment in favor of Doe.[18]

## III. CONCLUSION

Our conclusion that the district court's grant of summary judgment must be affirmed does not reflect a pronouncement on the ultimate legality or merit of the City's ban. We are sympathetic to the City's desire to ensure that its public libraries provide a safe, welcoming environment for its patrons, especially children. We therefore are especially mindful of concerns that registered sex offenders, whom studies have

---

[18] In light of our affirmance on Doe's First Amendment claim, we do not need to reach the issue of whether summary judgment was properly granted with respect to Doe's equal protection claim.

43

confirmed have a considerable rate of recidivism, may threaten to shatter the peace and safety of this environment.

Although we hold these concerns, as an appellate court we are constrained by the record. And this record shows that in response to a motion for summary judgment, the City provided no evidence as to two dispositive Ward factors as to which it had the burden on summary judgment. While we are perplexed by the City's strategic decision here, it binds our hands in this case.

We note that our decision does not signal the death knell of the City's efforts, if it wishes to pursue them, to restrict access of registered sex offenders to the City's public libraries. We can imagine such an effort succeeding through a revised ordinance where it is shown that the restriction satisfies the three-prong time, place and manner Ward test. Like the Supreme Court, we "generally will not strike down a governmental action" for failure to leave open adequate alternative channels of communication "unless the government enactment will foreclose an entire medium of public expression across the landscape of a particular community or setting." Citizens for Peace in Space, 477 F.3d at 1225 (internal quotation marks omitted).

However, this evidence is not before us in this case, and therefore we must AFFIRM.