# Illinois Official Reports

## Appellate Court

---

**Carle Foundation v. Cunningham Township, 2016 IL App (4th) 140795**

---

| | |
|---|---|
| Appellate Court Caption | THE CARLE FOUNDATION, an Illinois Not-for-Profit Corporation, Plaintiff-Appellee, v. CUNNINGHAM TOWNSHIP; DAN STEBBINS, in His Official Capacity as Cunningham Township Assessor; and THE CITY OF URBANA, Defendants-Appellants, and THE CHAMPAIGN COUNTY BOARD OF REVIEW; ELIZABETH BURGENER-PATTON; MARK WHITSITT; JOSEPH MEENTS; DANIEL J. WELCH; and THE COUNTY OF CHAMPAIGN, Separate Appellants, and THE DEPARTMENT OF REVENUE; BRIAN HAMER, in His Official Capacity as Director of the Department of Revenue; and DIANNE HAYS, Defendants.–THE CARLE FOUNDATION, an Illinois Not-for-Profit Corporation, Plaintiff-Appellee, v. THE DEPARTMENT OF REVENUE and BRIAN HAMER, Its Director, Defendants-Appellants, and THE CHAMPAIGN COUNTY BOARD OF REVIEW; MARK WHITSITT, LAURA SANDEFUR, and ELIZABETH BURGENER-PATTON, as Members of The Champaign County Board of Review; JOSEPH MEENTS, Champaign County Supervisor of Assessments; CUNNINGHAM TOWNSHIP; DAN STEBBINS, Cunningham Township Assessor; DANIEL J. WELCH, Champaign County Treasurer; THE CITY OF URBANA; URBANA SCHOOL DISTRICT 116; and THE URBANA PARK DISTRICT, Defendants. |
| District & No. | Fourth District<br>Docket Nos. 4-14-0795, 4-14-0845 cons. |
| Filed | January 5, 2016 |
| Decision Under Review | Appeal from the Circuit Court of Champaign County, No. 8-L-202; the Hon. Charles McRae Leonhard, Judge, presiding. |

| Judgment | Reversed and remanded. |
| --- | --- |

| Counsel on Appeal | Frederic M. Grosser (argued), of Champaign, for appellants Cunningham Township, Dan Stebbins, and City of Urbana. |
| --- | --- |
| | Lisa Madigan, Attorney General, of Chicago (Carolyn E. Shapiro, Solicitor General, and Carl J. Elitz (argued), Assistant Attorney General, of counsel), for appellants Department of Revenue and Brian Hamer. |
| | Julia Rosenbaum Rietz, State's Attorney, of Champaign (Joel D. Fletcher (argued), Assistant State's Attorney, of counsel), for other appellants. |
| | Steven F. Pflaum (argued), of Neal Gerber & Eisenberg LLP and Amy G. Doehring and Lisa Haidostian, both of McDermott Will & Emery LLP, both of Chicago, and William J. Brinkmann, of Thomas Mamer & Haughey, LLP, of Champaign, for appellee. |
| | John M. Izzo, Kimberly M. Jannotta, and Eugene C. Edwards, all of Hauser Izzo, LLC, of Flossmoor, for *amicus curiae*. |

| Panel | JUSTICE APPLETON delivered the judgment of the court, with opinion. |
| --- | --- |
| | Justices Turner and Steigmann concurred in the judgment and opinion. |

## OPINION

¶ 1    Plaintiff, The Carle Foundation, brought this action to establish that four of its properties were exempt from real estate taxation. The trial court granted a partial summary judgment that section 15-86 of the Property Tax Code (Code) (35 ILCS 200/15-86 (West 2014)) governed that question. Defendants, the state and local taxing authorities, appeal pursuant to Illinois Supreme Court Rule 304(a) (eff. Feb. 26, 2010).

¶ 2    We conclude that because section 15-86 is unconstitutional, it is inapplicable to the question of whether the four parcels are exempt from taxation. Therefore, we reverse the trial court's judgment, and we remand this case for further proceedings.

## I. BACKGROUND

### A. The Four Parcels

Plaintiff owns four parcels of land in Urbana: 611 West Park Street, 503 North Coler Avenue, 607 North Orchard Street, and 809 West Park Street. Plaintiff's affiliate, Carle Foundation Hospital, operates a hospital on two of these parcels. On the third parcel is a day care center, which serves the families of plaintiff's employees (among others). On the fourth parcel is a power plant, which services these parcels.

### B. The Reclassification of the Parcels
### From Exempt to Nonexempt

Before 2004, the four parcels were not taxed. They were considered to be exempt under section 15-65(a) of the Code (35 ILCS 200/15-65(a) (West 2002)) because of charitable use.

For 2004, however, the Cunningham township assessor began assessing the four parcels at their full value as nonexempt. She continued doing so through 2011.

### C. Plaintiff Applies for the Restoration of the Exemptions
### for the Years 2004 and 2005

Plaintiff filed applications with the county board of review, asking the board to exempt the four parcels from taxation for the years 2004 and 2005. The board forwarded these applications to the Department of Revenue (Department), along with a recommendation of denial.

On February 23, 2007, the Department denied plaintiff's applications for 2004 and 2005, whereupon plaintiff requested an administrative hearing.

### D. Our Intervening Decision
### in *Carle Foundation v. Department of Revenue*

On December 13, 2007, plaintiff filed an action in the circuit court against the Department and various local governmental entities, seeking a declaratory judgment that, under section 15-65, the four parcels were exempt from taxation for the years 2004 to 2007. (Eventually, plaintiff filed an exemption application with the board for 2008 as well.)

On March 3, 2009, the circuit court certified some questions for interlocutory appeal (see Ill. S. Ct. R. 308(a) (eff. Feb. 1, 1994)), requesting guidance on the meaning of the statutory phrase "court proceedings to establish an exemption" in section 23-25(e) of the Code (35 ILCS 200/23-25(e) (West 2008)).

On October 29, 2009, we held that, in cases in which the Department or a court of review had acted favorably on a comparable exemption claim for any other year, section 23-25(e) had effectively revived the traditional suit in equity to establish an exemption. *Carle Foundation v. Illinois Department of Revenue*, 396 Ill. App. 3d 329, 341 (2009). We further held that a taxpayer had to elect its remedy instead of simultaneously pursuing both a judicial action under section 23-25(e) and an application before the Department. *Id.* at 342. Because no court, however, had ever before interpreted section 23-25(e), we allowed plaintiff, on remand, to elect one of those remedies. *Id.* at 343.

¶ 16            **E. Plaintiff Withdraws Its Applications for 2004 and 2005**
**and Enters Into an Anti-Preclusion Agreement With the Department**

¶ 17      On August 18, 2010, when the applications for 2004 and 2005 were about to go to an administrative hearing, plaintiff informed the administrative law judge that it was withdrawing its applications for 2004 and 2005. Accordingly, the administrative hearing was canceled.

¶ 18      Despite plaintiff's expressed desire to withdraw the applications for 2004 and 2005, the Department went ahead and issued plaintiff formal letters denying these applications.

¶ 19      Plaintiff never requested a rehearing.

¶ 20            **F. Plaintiff Files Applications for 2006 to 2008**
**and Later Withdraws Those Applications, Too**

¶ 21      As we said, plaintiff likewise filed, with the county board, applications to exempt the four parcels for the years 2006, 2007, and 2008. The board likewise recommended the denial of those applications and forwarded them to the Department for decision.

¶ 22      In March 2012, plaintiff informed the Department it was withdrawing its applications for 2006 to 2008. As of that time, the Department had not yet made an initial decision on those applications.

¶ 23      On March 29, 2012, despite plaintiff's notification of withdrawal, the Department issued formal denials of the applications for 2006 to 2008. Plaintiff never requested an administrative hearing.

¶ 24            **G. Plaintiff Filed No Applications for 2009 to 2011**

¶ 25      Plaintiff filed with the board no application to exempt the four parcels from taxation for 2009, 2010, and 2011.

¶ 26            **H. The Fourth Amended Complaint**

¶ 27      Plaintiff claims, in its fourth amended complaint, that the four parcels should be exempt from real estate taxes during the assessment years 2004 to 2011 on the ground of charitable use.

¶ 28      The fourth amended complaint has 35 counts. If we were to organize them by the legal theories they advance, these counts would fall into four categories.

¶ 29      The first category would consist of a single count, count I. In this count, plaintiff alleges that preexisting exemptions of the four parcels never were validly discontinued. Sometime before 2004, the Department or its predecessor agency determined the four parcels to be exempt, and, in plaintiff's view, the local taxing officials lacked the statutory authority to override the Department's determination and end the exemptions.

¶ 30      The second category would consist of counts III through XXXIV (we have not forgotten about count II; we will come to it in a moment). In those counts, plaintiff alleges that if, contrary to plaintiff's position in count I, the local taxing authorities had authority to return the four parcels to the tax rolls and "thereby force [plaintiff] to establish anew its entitlement to an exemption on those properties, *de novo* consideration of the exemption issue [would lead] to the conclusion that [plaintiff] has satisfied the legal criteria for an exemption for each of the parcels and tax years in question," 2004 to 2011. Those "legal criteria," according to counts III

through XXXIV, are to be found in the recently enacted section 15-86 (35 ILCS 200/15-86 (West 2014)), added to the Code by Public Act 97-688 (Pub. Act 97-688, § 5-55 (eff. June 14, 2012)), or, alternatively, if section 15-86 is inapplicable, the "legal criteria" are to be found in an older provision of the Code, section 15-65 (35 ILCS 200/15-65 (West 2014)).

¶ 31    The third category would consist of count II, which seeks a declaratory judgment "that Section 15-86 applies to any determination of [plaintiff's] entitlement to exemptions for the Four Parcels for tax assessment years 2004 through 2011."

¶ 32    The fourth and final category would consist of count XXXV, in which plaintiff alleges the breach of a settlement agreement from 2002. Allegedly, under this settlement agreement, plaintiff paid $775,000 to various local taxing bodies, including Cunningham Township and the City of Urbana, and, in return, the local taxing bodies promised to "refrain from taking any action to challenge [plaintiff's] entitlement to charitable exemptions with respect to certain properties owned by [plaintiff], including the Four Parcels involved in this litigation." Plaintiff accuses Cunningham Township and City of Urbana of breaking that promise.

¶ 33                        I. Summary Judgment in Plaintiff's Favor
                        on Count II of the Fourth Amended Complaint

¶ 34    Plaintiff moved for a summary judgment on count II of its fourth amended complaint, the count seeking a declaratory judgment that the newly enacted section 15-86 of the Code (35 ILCS 200/15-86 (West 2014)) applied to the claims for exemption in counts III to XXXIV, which covered the period of 2004 to 2011.

¶ 35    The trial court granted plaintiff's motion for summary judgment on count II. Later, on August 28, 2014, in a modified opinion, the court held that section 15-86 applied to plaintiff's claims of exemption and that by enacting section 15-86, the legislature had repudiated the supreme court's description of "the distinctive characteristics of a charitable institution" in *Methodist Old Peoples Home v. Korzen*, 39 Ill. 2d 149, 157 (1968). The modified opinion included a Rule 304(a) finding.

¶ 36    In addition to the Department, two groups of defendants appeal. We will call the first group "the township defendants." They consist of Cunningham Township; Dan Stebbins, in his official capacity as Cunningham township assessor; and the City of Urbana. We will call the second group "the county defendants." And on the motion of the assistant State's Attorney, we substitute one of these county defendants for another: Joseph Meents, the current supervisor of assessments for Champaign County, is substituted for Stan Jenkins, who previously held that office. The remaining county defendants are Champaign County; the Champaign County Board of Review; Dianne Hays, Elizabeth Burgener-Patton, and Mark Whitsett, in their official capacities as members of the Champaign County Board of Review; and Daniel J. Welch, in his official capacity as the Champaign County treasurer.

¶ 37                                    II. ANALYSIS
¶ 38                            A. Our Subject-Matter Jurisdiction
¶ 39    The trial court granted plaintiff's motion for a summary judgment on count II of the fourth amended complaint, and the court made a Rule 304(a) finding. The other counts, *i.e.*, count I and counts III through XXXV, remain pending. Do we have subject-matter jurisdiction under Rule 304(a)?

¶ 40    We have a Rule 304(a) finding, but that is not enough. We also must have a final judgment on a separate claim or else we lack jurisdiction. Ill. S. Ct. R. 304(a) (eff. Feb. 26, 2010) ("a final judgment as to one or more but fewer than all of the parties or claims"). "[A] final order under Rule 304(a) must be final in the sense that it disposes of the rights of the parties, either upon the entire controversy or upon *some definite and separate part thereof*." (Emphasis added and internal quotation marks omitted.) *In re Estate of French*, 166 Ill. 2d 95, 101 (1995). A Rule 304(a) finding cannot create finality where there is none. *Kellerman v. Crowe*, 119 Ill. 2d 111, 115 (1987). Without a final judgment on a separate claim, a Rule 304(a) finding is ineffectual. *Id.*

¶ 41    As for whether the summary judgment on count II qualifies as a final judgment on a separate claim, *In re Marriage of Best*, 228 Ill. 2d 107 (2008), and *In re Marriage of Leopando*, 96 Ill. 2d 114 (1983), appear to be the most relevant cases–but the parties are not in unanimity as to the conclusion to draw from those cases. On the one hand, plaintiff and the township defendants believe we have jurisdiction under *Best*. On the other hand, the county defendants and the Department regard *Best* as distinguishable, and they believe that, under *Leopando*, we lack jurisdiction (although, for safety's sake, the county defendants and the Department filed their own notices of appeal).

¶ 42    Let us take a look, then, at *Best* and *Leopando* to see which of those cases the present case most resembles.

¶ 43    In *Best*, Steven Best filed a petition for dissolution of marriage, and afterward he filed an amended motion for a declaratory judgment, in which he sought a ruling on the validity and meaning of a premarital agreement. *Best*, 228 Ill. 2d at 110. The trial court granted his motion for a declaratory judgment, ruling that (1) the premarital agreement was valid and enforceable and (2) a waiver of attorney fees, in section 19 of the premarital agreement, was inapplicable to custody proceedings. *Id.* The declaratory judgment included a Rule 304(a) finding, and Steven Best appealed, arguing that, contrary to the declaratory judgment, the waiver of attorney fees applied to custody proceedings. *Id.*

¶ 44    The first thing the appellate court did, upon receiving Steven Best's appeal, was consider whether it had jurisdiction under Rule 304(a). As the appellate court perceived, that depended on whether the declaratory judgment was a final judgment on a separate claim. *Id.* at 112-13. The appellate court concluded it was.

¶ 45    Having decided it had jurisdiction, the appellate court reversed the declaratory judgment because, in the appellate court's opinion, the declaratory judgment had failed to "terminate the controversy[,] or some part thereof, giving rise to the proceeding," as section 2-701(a) of the Code of Civil Procedure (735 ILCS 5/2-701(a) (West 2004)) required declaratory judgments to do. *Best*, 228 Ill. 2d at 109.

¶ 46    The case then went to the supreme court, which disagreed that section 2-701(a) was unfulfilled. By construing the premarital agreement, the supreme court observed, the declaratory judgment had indeed terminated *part* of the controversy. *Id.* at 117.

¶ 47    For our purposes, though, the most important discussion in *Best* comes earlier. Before reaching the question of whether the declaratory judgment had terminated part of the controversy, the supreme court scrutinized the appellate court's jurisdiction: the supreme court considered whether the appellate court was correct in its conclusion that the declaratory judgment was a final judgment on a separate claim–a prerequisite to jurisdiction under Rule 304(a). *Id.* at 113.

¶ 48     The appellate court, in its jurisdictional analysis, had identified *Leopando* as the case of potential concern. *Id.* In *Leopando*, the trial court entered an order dissolving the parties' marriage, and then the court entered an order awarding permanent custody of the parties' child to the father. *Leopando*, 296 Ill. 2d at 116. The custody order made a Rule 304(a) finding and reserved the issues of maintenance, property division, and attorney fees. *Id.* Was the custody order in *Leopando* appealable under Rule 304(a)?

¶ 49     The supreme court answered no in *Leopando* because, instead of resolving a separate claim, the custody order had resolved an issue within the claim for dissolution of the parties' marriage. *Id.* at 119. The supreme court explained:

> "A petition for dissolution advances a single claim; that is, a request for an order dissolving the parties' marriage. The numerous other issues involved, such as custody, property disposition, and support are merely questions which are *ancillary* to the cause of action. [Citation.] They do not represent separate, unrelated claims; rather, they are separate issues relating to the *same* claim." (Emphases in original.) *Id.*

¶ 50     Given the dichotomy, in *Leopando*, between *a claim* and *an issue within a claim*, it might have been easy to assume, in *Best*, that the validity and meaning of the premarital agreement were *issues* within the *claim* for dissolution of marriage–but the appellate court did not see it that way, and neither did the supreme court. See *Best*, 228 Ill. 2d at 113. The supreme court agreed with the appellate court that *Leopando* was distinguishable and that, unlike the custody ruling in *Leopando*, the declaratory judgment was a final judgment on a separate claim. *Id.* at 115.

¶ 51     According to the supreme court, *Leopando* was distinguishable for two reasons.

¶ 52     First, the trial court in *Leopando* awarded permanent custody to the father, whereas in *Best* the trial court merely issued a declaratory judgment without making any actual award. *Id.* at 114. In *Leopando*, custody was part of the claim for dissolution of marriage, and, consequently, by granting custody, the trial court adjudicated part of the *same* claim instead of entering a final judgment on a *separate* claim. By contrast, the validity and meaning of the premarital agreement in *Best* were not part of the claim for dissolution of marriage, and by holding the premarital agreement to be valid and by interpreting section 19 of the premarital agreement, the trial court merely decided some threshold legal issues without actually awarding any relief on the claim for dissolution of marriage. In its declaratory judgment, the court did not–and could not–award custody, for instance, or divide property or dissolve the marriage: all those things still had to be done. In fact, the trial court in *Best* could have issued the requested declaratory judgment without thereafter granting *any* of the relief the dissolution petition requested. Therefore, the supreme court reasoned in *Best*, the motion for a declaratory judgment was a separate claim. *Id.* at 115.

¶ 53     Second, the petitioner in *Leopando* had requested no relief outside that available under the Illinois Marriage and Dissolution of Marriage Act (Dissolution Act) (Ill. Rev. Stat. 1981, ch. 40, ¶ 101 *et seq.*), whereas the petitioner in *Best* requested relief under both the Dissolution Act and a separate statute, the declaratory judgment statute (735 ILCS 5/2-701 (West 2004)). *Best*, 228 Ill. 2d at 114-15. Therefore, "[in contrast] to *Leopando*, the two requests for relief here had distinctly different statutory bases," the supreme court observed. *Id.* at 115.

¶ 54     For those reasons, the supreme court concluded in *Best*:

"Under the facts and circumstances of this case, the request for dissolution of the parties' marriage and the request for declaratory judgment on the validity and interpretation of the premarital agreement are not so closely related that they must be deemed part of a single claim for relief, as they were in *Leopando*. Thus, *Leopando* is distinguishable." *Id.*

¶ 55    Following the lead of the supreme court in *Best*, we conclude that *Leopando* likewise is distinguishable from the present case. It is distinguishable for essentially the same two reasons.

¶ 56    First, by issuing a declaratory judgment that section 15-86 (30 ILCS 200/15-86 (West 2014)) applied to plaintiff's claims for a charitable exemption for the assessment years 2004 to 2011, the trial court "did not make any actual awards": the court did not hold that any of the four parcels actually were exempt for any assessment year. *Best*, 228 Ill. 2d at 114.

¶ 57    Second, in the proceedings below, plaintiff "sought nondeclaratory relief" under the Code (35 ILCS 200/1-1 to 32-20 (West 2014)) "as well as declaratory relief under the declaratory judgment statute" (735 ILCS 5/2-701 (West 2014)), just as Steven Best sought both nondeclaratory and declaratory relief. *Best*, 228 Ill. 2d at 115. Plaintiff invoked two different statutes. *Heinrich v. Peabody International Corp.*, 99 Ill. 2d 344, 348 (1984); *Rice v. Burnley*, 230 Ill. App. 3d 987, 991 (1992).

¶ 58    For those reasons, which come straight from *Best*, we find *Leopando* to be distinguishable, and we conclude that we have subject-matter jurisdiction over defendants' appeals. Count II, on the one hand, and counts III through XXXIV, on the other hand, "are not so closely related that they must be deemed part of a single claim for relief." *Best*, 228 Ill. 2d at 115. By granting the declaratory relief requested by count II, the trial court entered a final judgment on a separate claim. See *id.* In sum, all the ingredients of subject-matter jurisdiction are here: a Rule 304(a) finding, a final judgment on a separate claim, and timely notices of appeal.

¶ 59    B. An Overview of the Administrative Procedures
for Establishing and Maintaining
an Exemption from Property Taxes

¶ 60    This is an action pursuant to section 23-25(e) of the Code (35 ILCS 200/23-25(e) (West 2014)), and as we will explain a little later, the legislature intended, in section 23-25(e), to provide an exception to the administrative procedures for obtaining an exemption from property taxes. In order that the reader will understand what section 23-25(e) is an exception to, we will give this brief overview of the administrative procedures for obtaining an exemption.

¶ 61    1. *Establishing an Exemption for the First Time*

¶ 62    Although the General Assembly has categorically exempted certain real estate from taxation (35 ILCS 200/15-35 to 15-185 (West 2014)), anyone wishing to establish an exemption for a particular parcel of real estate must apply for one. "Any person wishing to claim an exemption for the first time" must file an application with the county board of review (in counties with less than 1 million inhabitants) or with the board of appeals (in counties with 1 million or more inhabitants, *i.e.*, Cook County). 35 ILCS 200/15-5 (West 2014); see also 11 Eunice A. Eichelberger, Illinois Real Property Service § 59:78, at 62 (Edward W. Jessen & Erwin S. Barbre *et al.* eds., 1989). (For our purposes, it is unnecessary to differentiate between

the board of review and the board of appeals: we will refer to them, indiscriminately, as "the board.")

¶ 63    The board will make a decision on the application for an exemption, but its decision will not be final (except as to homestead exemptions). 35 ILCS 200/16-70, 16-130 (West 2014). Rather, the board will "make out and forward to the Department[ ] a full and complete statement of all the facts in the case." 35 ILCS 200/16-70 (West 2014). The Department then will decide whether the property is exempt from taxation, after which it will notify the board of its decision, and, if necessary, the board will correct the assessment. 35 ILCS 200/16-70, 16-130 (West 2014). At the same time the Department notifies the board of its exemption decision, the Department will notify the applicant, by certified mail. 35 ILCS 200/8-35 (West 2014).

¶ 64    If the Department decides the property is exempt, "any taxes extended upon the unauthorized assessment shall be abated or, if paid, shall be refunded." 35 ILCS 200/16-70; see also 35 ILCS 200/16-130 (West 2014). (Payment of taxes will not be delayed by the board's consideration of the application or by the Department's review of the board's recommmendatory decision. 35 ILCS 200/16-70, 16-130 (West 2014).) If, alternatively, the Department decides the property should be taxed, the landowner may file, with the Department, an application for a hearing. 35 ILCS 200/8-35(b) (West 2014).

¶ 65    When the Department makes a decision on the application for exemption forwarded by the board, "any party to the proceeding who feels aggrieved by the decision may file an application for hearing." *Id.* The application for hearing has to be filed with the Department within 60 days after the Department gave notice, by certified mail, of its initial decision, and the application has to state the mistakes allegedly made and the new evidence to be presented. *Id.*

¶ 66    Upon receiving an application for hearing, the Department will reconsider its exemption decision and will grant any party to the proceeding a hearing. *Id.* After the hearing, the Department will issue a notice of decision, again by certified mail. *Id.* The notice of decision will set forth the findings of fact and the bases of the Department's decision. *Id.*

¶ 67    Within 30 days after the Department mails its notice of decision, any party to the proceeding may file with the Department a request for rehearing. *Id.* The Department does not have to grant the request. If the Department allows a rehearing, it will issue a revised decision as a result of the rehearing. *Id.*

¶ 68    The action of the Department on an application for hearing will become final the later of (1) 30 days after the issuance of a notice of decision, if no request for rehearing is made or, (2) if a timely request for rehearing is made, upon the issuance of the denial of the request for rehearing or upon the issuance of a notice of final decision. *Id.*

¶ 69    No action for judicial review of an exemption decision by the Department (see 35 ILCS 200/8-40 (West 2014)) is allowed unless the party commencing the action has filed with the Department an application for a hearing and the Department has acted upon the application. 35 ILCS 200/8-35(b) (West 2014).

¶ 70    The judicial review will be in accordance with the Administrative Review Law (735 ILCS 5/3-101 to 3-113 (West 2014)). 35 ILCS 200/8-40 (West 2014).

## 2. *Maintaining an Exemption After It Is Granted*

After an exemption has been granted, all property owners, except the United States and those with certain types of homestead exemptions, must file a certificate of status with the county assessor or the supervisor of assessments on or before January 31 of each year. 35 ILCS 200/15-10 (West 2014). The certificate of status must state, under oath, whether there has been any change in the ownership or use of the property, and, if there has been a change, the certificate must state the nature of the change. *Id.* The assessment officer has the discretion to terminate an exemption in the event of a failure to file this sworn certificate. *Id.*

## C. An Introduction to Section 15-86

In its declaratory judgment, which defendants have appealed, the trial court held that section 15-86 applied to this judicial proceeding pursuant to section 23-25(e) (35 ILCS 200/23-25(e) (West 2014)). Consequently, this appeal requires an understanding of section 15-86. To that end, we provide this introduction.

Public Act 97-688 (Pub. Act 97-688, § 5-55 (eff. June 14, 2012)) added section 15-86 (35 ILCS 200/15-86 (West 2012)) to the Code.

The preamble to section 15-86 says: "It is the intent of the General Assembly to establish a new category of ownership for charitable property tax exemption to be applied to not-for-profit hospitals and hospital affiliates in lieu of the existing ownership category of 'institutions of public charity.' " 35 ILCS 200/15-86(a)(5) (West 2014). "Institutions of public charity" is a phrase from a preexisting section of the Code, section 15-65(a) (35 ILCS 200/15-65(a) (West 2012)), which provides as follows:

> "§ 15-65. Charitable purposes. All property of the following is exempt when actually and exclusively used for charitable or beneficent purposes, and not leased or otherwise used with a view to profit:
>
> (a) *Institutions of public charity*." (Emphasis added.)

Previously, under section 15-65(a), a hospital had to be owned by an "[i]nstitution[ ] of public charity" to qualify for a charitable exemption. *Id.* In section 15-86, the legislature intended to eliminate that requirement as to hospitals and to require, instead, that the owner of the hospital be a "not-for-profit corporation." 35 ILCS 200/15-86(b)(2), (b)(6), (c) (West 2014). (Article IX, section 6, of the Illinois Constitution (Ill. Const. 1970, art. IX, § 6) does not require, as a condition of a charitable exemption, that the property be owned by a charitable institution or by any particular type of owner. It requires merely that the property be "used exclusively for *** charitable purposes." *Id.* Charitable ownership is an additional, statutory prerequisite to the exemption, which the legislature imposed (35 ILCS 200/15-65(a) (West 2014))–as the legislature was free to do, given that, in the first place, it did not have to create any exemption at all. *Provena Covenant Medical Center v. Department of Revenue*, 384 Ill. App. 3d 734, 741 (2008).)

In addition to establishing this "new category of ownership for [the] charitable property tax exemption," the legislature intended, in section 15-86, to "establish quantifiable standards for the issuance of charitable exemptions for such property." 35 ILCS 200/15-86(a)(5) (West 2014). The legislature wanted to dispel the "considerable uncertainty surrounding the test for charitable property tax exemption, especially regarding the application of a quantitative or monetary threshold." 35 ILCS 200/15-86(a)(1) (West 2014). For a long time, it had been

unclear what quantity of charity a hospital had to provide to qualify for the charitable exemption. In section 15-86, the legislature meant to clear up that ambiguity, right down to the dollar amount.

¶ 79    Nothing could be clearer than subsection (c) (35 ILCS 200/15-86(c) (West 2014)), which provides as follows: "A hospital applicant satisfies the conditions for an exemption under this Section with respect to the subject property, and shall be issued a charitable exemption for that property, if the value of services or activities listed in subsection (e) [(35 ILCS 200/15-86(e) (West 2014))] for the hospital year equals or exceeds the relevant hospital entity's estimated property tax liability, as determined under subsection (g) [(35 ILCS 200/15-86(g) (West 2014))], for the year for which exemption is sought."

¶ 80    Thus, subsection (c) contemplates the comparison of two numbers. The first number is the total dollar amount of "[s]ervices that address the health care needs of low-income or underserved individuals or relieve the burden of government with regard to health care services." 35 ILCS 200/15-86(e) (West 2014). The hospital had to provide these services during the "hospital year," defined as the hospital's fiscal year ending in the year for which the exemption is sought (35 ILCS 200/15-86(b)(9) (West 2014)). The second number is the estimated property tax liability for the year for which an exemption is sought. 35 ILCS 200/15-86(c) (West 2014). If the first number equals or exceeds the second number, the hospital is to be given an exemption for the subject property. *Id.*

¶ 81    What "services and activities" count as charity, to be measured against the estimated property tax liability? *Id.* Subsection (e) (35 ILCS 200/15-86(e) (West 2014)) lists them under the heading of "Services that address the health care needs of low-income or underserved individuals or relieve the burden of government." Such services include "[c]harity care," defined as "[f]ree or discounted services provided pursuant to the relevant hospital entity's financial assistance policy, measured at cost, including discounts provided under the Hospital Uninsured Patient Discount Act [(210 ILCS 89/1 to 30 (West 2014))]." 35 ILCS 200/15-86(e)(1) (West 2014). Off-site subsidies also count, including financial support to unaffiliated hospitals (35 ILCS 200/15-86(e)(2) (West 2014)), financial or in-kind support to community clinics (*id.*), and direct subsidies to the state government or to local governments to pay for activities or programs related to health care for low-income or underserved individuals (35 ILCS 200/15-86(e)(3) (West 2014)).

¶ 82    The "hospital applicant" will list all these services and activities, along with their respective dollar values, on an application form provided by the Department, and the "hospital applicant" will attach all the necessary, supporting records to its application. 35 ILCS 200/15-86(d), (h) (West 2014). Because a "hospital applicant" is, by definition, "a hospital owner or hospital affiliate that files an application for a property tax exemption pursuant to Section 15-5 [(35 ILCS 200/15-5 (West 2014))] and this Section" (35 ILCS 200/15-86(b)(6) (West 2014)), the "hospital applicant" will file its application "with the county board of review or board of appeals" (35 ILCS 200/15-5 (West 2014)). Then, like any other application for an exemption, the application will go through the process of administrative adjudication we already have described.

¶ 83                                    D. Whether Section 15-86 Applies

to an Action Pursuant to Section 23-25(e)

¶ 84       It is pretty clear that whenever a hospital owner seeks, "for the first time," an exemption pursuant to section 15-86 for a particular parcel of real estate, the legislature intends the hospital owner to go through the administrative process we have described. 35 ILCS 200/15-5 (West 2014). We know that because, under the terms of section 15-86, the hospital owner has to fill out an application, using a form provided by the Department, and the hospital owner has to file this application with the county board of review or the board of appeals, pursuant to section 15-5. 35 ILCS 200/15-86(b)(6), (b)(8), (h) (West 2014).

¶ 85       So, the legislature envisions that, in the first instance, the board and then the Department will apply section 15-86 to the question of whether a given parcel is exempt from taxation. In a subsequent action for administrative review, the trial court may have occasion to scrutinize the Department's application of section 15-86, but the court will be deferential toward the Department's factual findings. See 735 ILCS 5/3-110 (West 2014) ("The findings and conclusions of the administrative agency on questions of fact shall be held to be prima facie true and correct.").

¶ 86       Because section 15-86, by its terms, contemplates an *administrative* determination of the application for exemption, we have to ask whether it makes sense to say, as the trial court did, that section 15-86 applies to this *judicial* proceeding pursuant to section 23-25(e) (35 ILCS 200/23-25(e) (West 2014)). (We do not even reach the question of section 15-86's constitutionality unless we first find that section 15-86 is applicable to this judicial proceeding.)

¶ 87       How can this pervasively administrative statute, section 15-86, apply to a judicial proceeding under section 23-25(e)? After all, section 23-25(e) is supposed to be an *alternative* to administrative procedures. It reads as follows:

          "(e) The limitation in this Section shall not apply to court proceedings to establish an exemption for any specific assessment year, provided that the plaintiff or its predecessor in interest in the property has established an exemption for any subsequent or prior assessment year on grounds comparable to those alleged in the court proceedings. For purposes of this subsection, the exemption for a subsequent or prior year must have been determined under Section 8-35 [(35 ILCS 200/8-35 (West 2014))] or a prior similar law by the Department or a predecessor agency, or under Section 8-40 [(35 ILCS 200/8-40 (West 2014))]. Court proceedings permitted by this subsection may be initiated while proceedings for the subsequent or prior year under Section 16-70 [(35 ILCS 200/16-70 (West 2014))], 16-130 [(35 ILCS 200/16-130 (West 2014))], 8-35, or 8-40 are still pending, but judgment shall not be entered until the proceedings under Section 8-35 or 8-40 have terminated." *Id.*

¶ 88       The phrase at the beginning of the quoted passage–"[t]he limitation in this Section"–means the requirement of obtaining a final decision by the Department as to the assessment year in question before filing an action in the circuit court. See 35 ILCS 200/23-25(a) (referring to section 8-40 (35 ILCS 200/8-40 (West 2014))). The plaintiff may skip the normally obligatory process of litigating to finality before the Department, and may go directly to the circuit court, if, "for any subsequent or prior assessment year"–that is, any assessment year that came after or before the assessment year in question–the plaintiff obtained an exemption of the parcel "on

grounds comparable to those alleged in the court proceedings." 35 ILCS 200/23-25(e) (West 2014).

¶ 89 "[T]he exemption for a subsequent or prior year must have been determined under Section 8-35 [(35 ILCS 200/8-35 (West 2014))] or a prior similar law by the Department or a predecessor agency, or under Section 8-40 [(35 ILCS 200/8-40 (West 2014))]." *Id.* In other words, the Department must have issued a final administrative decision granting an exemption for a subsequent or prior year (35 ILCS 200/8-35(b) (West 2014))–or, alternatively, in an action for administrative review, a circuit court must have reversed a final administrative decision in which the Department denied an exemption for a subsequent year or prior year (35 ILCS 200/8-40 (West 2014)).

¶ 90 Thus, as to the subject property, section 23-25(e) presupposes a favorable decision, under sections 8-35 or 8-40, for a subsequent or prior assessment year. But precisely what function does this favorable decision serve in a proceeding pursuant to section 23-25(e)? What did the legislature intend in this respect, as evidenced by the language of that statute? See *Paris v. Feder*, 179 Ill. 2d 173, 177 (1997).

¶ 91 Plaintiff seems to take the view that the favorable decision serves merely as an admission ticket into the circuit court and that once the taxpayer is admitted, the ticket is forgotten and the court applies section 15-86 in a *de novo* determination of whether the parcel deserves an exemption for the assessment year in question. In this view, the circuit court would function as a super agency. *Cf.* 35 ILCS 200/16-70 (West 2014) ("The Department shall determine whether the property is legally liable to taxation.").

¶ 92 We can think of a different interpretation of section 23-25(e), an interpretation that would have the advantage of not transforming the circuit court into a clone of the Department. The legislature could have intended the favorable decision to serve not merely as an admission ticket into the circuit court, but as an object of comparison in the trial. The trial would compare two sets of facts: the facts existing during the assessment year in question and the facts on which the Department or the circuit court relied when finding the parcel to be exempt for a subsequent or prior year. That would not be the same thing as taking over the Department's job. There is a significant difference between, on the one hand, trying to do the Department's job by processing an application for an exemption and, on the other hand, looking at the facts in an application that previously was granted and asking the Department, "Why did you deny an exemption this time, considering that the facts proven by the plaintiff appear to be substantially the same as the facts set forth in this application for a subsequent or prior, which was granted? Or, in your view, are the facts different?" Instead of becoming a redundant agency, the court would be on the lookout for arbitrariness in the form of an inconsistent treatment of substantially the same facts.

¶ 93 In our *de novo* review (*Paris*, 179 Ill. 2d at 177-78), we favor this interpretation of section 23-25(e) that envisions a comparison of facts, not only because this interpretation preserves the relevance of the Department (which, after all, is the expert, with lots of experience) but also because it lines up with the statutory phrase "grounds comparable to those alleged in the court proceedings": "The limitation in this Section shall not apply to court proceedings to establish an exemption for any specific assessment year, provided that the plaintiff or its predecessor in interest in the property has established an exemption for any subsequent or prior assessment year *on grounds comparable to those alleged in the court proceedings*." (Emphasis added.) 35 ILCS 200/23-25(e) (West 2014). When adding section 23-25(e) to the Code in 1998 (Pub. Act

90-679, § 5 (eff. July 31, 1998)), the legislature presumably knew that Illinois was a fact-pleading jurisdiction (*Knox College v. Celotex Corp.*, 88 Ill. 2d 407, 426-27 (1981); *Richco Plastic Co. v. IMS Co.*, 288 Ill. App. 3d 782, 784 (1997)) and that "grounds" "alleged in the court proceedings" necessarily would be factual grounds. See *Nelson v. Kendall County*, 2014 IL 116303, ¶ 27.

¶ 94    Here, then, is the procedure the legislature must have contemplated. In an action pursuant to section 23-25(e), the plaintiff would allege and prove that, as to the subject property, a certain set of facts existed during the assessment year in question and that substantially the same facts caused that property to be exempt for a subsequent or prior assessment year. By hearing this evidence, the circuit court would not make a *de novo* determination, so much as compare two sets of facts, to see if the Department is being inconsistent or arbitrary.

¶ 95    Unless the two sets of facts are materially different or unless the Department convinces the circuit court that the exemption for the subsequent or prior assessment year actually was unlawful (see *Brown's Furniture, Inc. v. Wagner*, 171 Ill. 2d 410, 432 (1996) ("[T]his court has refused to estop the State from reexamining a taxpayer's liability even when returns for the relevant tax period have been filed and approved."); *Austin Liquor Mart, Inc. v. Department of Revenue*, 51 Ill. 2d 1, 4 (1972) ("It is firmly established that where the public revenues are involved, public policy ordinarily forbids the application of estoppel to the State."), logic would likewise require an exemption for the assessment year in question.

¶ 96    Now that we understand how section 23-25(e) works, we return to our question: Did the legislature intend that section 15-86 would apply to a proceeding pursuant to section 23-25(e)? The legislature must have intended section 15-86 to apply at least indirectly. If section 15-86 was the authority for exempting the property from taxation for a subsequent or prior assessment year, section 15-86 would indirectly apply to the proceeding under section 23-25(e) through a comparison of facts: if under *those* facts the property was entitled to an exemption pursuant to section 15-86, it follows that under *these* comparable facts the property likewise is entitled to an exemption pursuant to section 15-86. Ultimately, the authority would be the same: section 15-86.

¶ 97    But what if the assessment year in question and a subsequent assessment year to which a comparison is being made are on different sides of the effective date of section 15-86: June 14, 2012? See Pub. Act 97-688, § 5-55 (eff. June 14, 2012) (adding section 15-86 to the Code). That is a dilemma the present case poses. Paragraph 4 of the fourth amended complaint alleges: "Before tax assessment year 2004, and then again for tax assessment year 2012, [plaintiff] obtained a determination from the [Department] or its predecessor agency under Section 8-35 or a prior law, or from a court under Section 8-40, that it was entitled to a full or partial exemption with respect to each of the Four Parcels."

¶ 98    It would seem, then, that, in this proceeding pursuant to section 23-25(e), plaintiff intends to compare the assessment years 2004 through 2011 not only to a prior assessment year, that is, a year prior to 2004, but also to a subsequent assessment year, 2012.

¶ 99    Assessment year 2012 was subject to section 15-86. The Department applied section 15-86 when determining the four parcels to be exempt for 2012, as Laurence J. Fallon, plaintiff's senior vice president of legal affairs, stated in his affidavit, dated July 15, 2013. He stated in paragraph 24:

         "24. Following the passage of P.A. 97-688 in 2012, [plaintiff] filed Section 15-5 applications seeking exemptions for the Four Parcels and other *** properties

- 14 -

[belonging to plaintiff], pursuant to the hospital property tax exemption contained in Section 15-86, for the 2012 tax year. A true and correct copy of the Certificates of Non-homestead exemption for the Four Parcels issued to [plaintiff] by the [Department] for the tax year 2012 is attached as Group Exhibit H."

¶ 100    So, after the passage of Public Act 97-688, plaintiff received an exemption for the assessment year 2012, and the exemption was pursuant to section 15-86. Now, in this proceeding pursuant to section 23-25(e), plaintiff wants to compare the assessment years 2004 to 2011, during which section 15-86 did not yet exist, to the assessment year 2012, when section 15-86 did exist. Can plaintiff do that? Is the anachronism permissible?

¶ 101    It depends on whether the legislature intended section 15-86 to apply retroactively. It also depends on whether section 15-86 is constitutional–but right now we will take up the question of retroactivity, in our continuing search for a nonconstitutional disposition of the township defendants' appeal.

¶ 102                               E. The Retroactivity of Section 15-86

¶ 103    At the outset, we should be clear what we mean by the retroactive application of section 15-86. A retroactive act (or statute) "operat[es] on transactions that have occurred or rights and obligations that existed before passage of the act." 2 Norman Singer & J.D. Shambie Singer, Statutes and Statutory Construction § 41:1, at 383 (7th ed. 2009). Therefore, section 15-86 would apply retroactively if it determined the exempt or nonexempt status of property on the basis of uses made of the property before June 14, 2012 (the effective date of section 15-86), or on the basis of other facts existing before that date.

¶ 104    Did the legislature intend section 15-86 to apply retroactively? In section 4 of the Statute on Statutes (5 ILCS 70/4 (West 2014)), the legislature has clearly manifested its intent that statutory amendments which are substantive in nature, in contrast to amendments affecting procedure, will apply only prospectively, not retroactively. *Caveney v. Bower*, 207 Ill. 2d 82, 92 (2003). By adding section 15-86 to the Code, Public Act 97-688 made a change that was substantive in nature: section 15-86(c) (35 ILCS 200/15-86(c) (West 2014)) specifies the conditions for a charitable exemption, specifically, "the value of services or activities" the hospital must provide during the "hospital year." Insomuch as section 15-86 prescribes procedures, they merely implement that substantive change. Because the addition of section 15-86 to the Code was a change that was substantive in nature, section 4 of the Statute on Statutes requires that the change be given only prospective effect–unless the legislature has clearly indicated otherwise in the amendatory act, Public Act 97-688. See *Caveney*, 207 Ill. 2d at 94-95.

¶ 105    Section 90 of Public Act 97-688 (codified as 35 ILCS 128/90 (West 2012)), entitled "Applicability," lists the administrative "decisions" and the "applications for property tax exemption" to which "[t]he changes made by this amendatory Act *** shall apply." Pub. Act 97-688, art. 99, § 90 (eff. June 14, 2012). By so doing, section 90 indicates the temporal reach of the changes. We will quote only the portions of section 90 that pertain to property tax exemptions:

> "Section 90. Applicability. The changes made by this amendatory Act of the 97th General Assembly to the Property Tax Code, the Illinois Income Tax Act, the Use Tax Act, the Service Occupation Tax Act, and the Retailers' Occupation Tax Act shall apply to: (1) all decisions by the Department on or after the effective date of this

- 15 -

amendatory Act of the 97th General Assembly regarding entitlement or continued entitlement by hospitals, hospital owners, hospital affiliates, or hospital systems to charitable property tax exemptions; (2) all applications for property tax exemption filed by hospitals, hospital owners, hospital affiliates, or hospital systems on or after the effective date of this amendatory Act of the 97th General Assembly; (3) all applications for property tax exemption filed by hospitals, hospital owners, hospital affiliates, or hospital systems that have either not been decided by the Department before the effective date of this amendatory Act of the 97th General Assembly, or for which any such Department decisions are not final and non-appealable as of that date ***." Pub. Act 97-688, art. 99, § 90(1), (2), (3) (eff. June 14, 2012) (codified as 35 ILCS 128/1-90(1), (2), (3) (West 2014)).

¶ 106   It is clear from section 90 of Public Act 97-688 that the legislature intended section 15-86 to apply retroactively. All three subsections of the quoted passage would entail the retroactive application of section 15-86.

¶ 107   Let us begin with subsection (1) (Pub. Act 97-688, art. 99, § 90(1) (eff. June 14, 2012) (codified as 35 ILCS 128/1-90(1) (West 2014))). If, as subsection (1) says, Public Act 97-688 applies to "all" decisions the Department makes on charitable exemptions on or after the effective date of the act, June 14, 2012, it follows that section 5-55 of Public Act 97-688, codified as section 15-86 of the Code, applies to all those decisions, including decisions pending on June 14, 2012–decisions that necessarily scrutinize the uses made of property before that date. *Id.*

¶ 108   Now let us look at subsection (2) (Pub. Act 97-688, art. 99, § 90(2) (eff. June 14, 2012) (codified as 35 ILCS 128/1-90(2) (West 2014))). Public Act 97-688, and therefore section 15-86, will apply to "all applications for property tax exemption filed *** on or after the effective date of this amendatory Act." *Id.* If a hospital files an application on June 14, 2012, the application necessarily will be based on uses made of the property before that date.

¶ 109   Finally, let us look at subsection (3) (Pub. Act 97-688, art. 99, § 90(3) (eff. June 14, 2012) (codified as 35 ILCS 128/1-90(3) (West 2014))), with its unfortunate double negative. Public Act 97-688, including section 15-86 of the Code, shall apply to "all applications for property tax exemption filed by hospitals *** that have either not been decided by the Department before the effective date of this amendatory Act ***, or for which any such Department decisions are not final and non-appealable as of that date" (*id.*)–by which the legislature apparently means "not final and appealable" (the "not" modifying both "final" and "appealable"). Thus, if, on June 14, 2012, the Department made a nonfinal decision on an application for a property tax exemption–an application that necessarily would concern uses of the property earlier than June 14, 2012–section 15-86 will apply to that application.

¶ 110   We conclude, then, that the legislature "plainly" intended section 15-86 to apply retroactively. *Caveney*, 207 Ill. 2d at 94-95.

¶ 111   The county defendants, perhaps anticipating that conclusion, argue it is untenable because the fourth amended complaint is not, in the words of sections 90(2) and (3) (Pub. Act 97-688, art. 99, § 90 (eff. June 14, 2012)), an "application[ ] for property tax exemption" (*cf.* 35 ILCS 200/15-5 (West 2014) ("Any person wishing to claim an exemption for the first time *** shall file an application with the county board of review ***.")), and a decision by the circuit court in a proceeding pursuant to section 23-25(e) is not, in the words of section 90(1) (Pub. Act 97-688, art. 99, § 90 (eff. June 14, 2012)), a "decision[ ] by the Department."

- 16 -

¶ 112    True enough, but plaintiff's action is pursuant to section 23-25(e), not section 90, and section 90 does not say that the changes made by Public Act 97-688 apply *only* to the items listed in section 90. Again, the question is not whether this action fits within section 90 but, rather, whether the legislature intended section 15-86 to apply retroactively. Section 90 clearly evinces such an intent. See *Caveney*, 207 Ill. 2d at 94-95.

¶ 113    Understandably, the county defendants are concerned about open-ended retroactivity. They point out that "[i]f a taxpayer can raise an exemption claim long after the [equalized assessed valuation] for a given year has been certified to the Department, there is no way for taxing districts to recoup the lost taxes: there is no statutory authority for the assessor to go back to prior years and collect additional taxes," to make up for the exemption that a court has retroactively granted. But we do not know how else to interpret the phrase "*any* subsequent *** assessment year" in section 23-25(e). (Emphasis added.) 35 ILCS 200/23-25(e) (West 2014). "*[A]ny* subsequent *** assessment year" can serve as the object of comparison, meaning that, in a proceeding pursuant to section 23-25(e), the plaintiff can obtain an exemption for an assessment year on the basis of an exemption granted anytime afterward, if the facts are comparable. (Emphasis added.) *Id.* If such open-ended retroactivity is unwise or impractical as public policy, the remedy is with the legislature, not with us. See *People ex rel. Brenza v. Gebbie*, 5 Ill. 2d 565, 583 (1955).

¶ 114                                          F. Is Section 15-86 Constitutional?
¶ 115                              1. *The Unavoidability of This Constitutional Question*
¶ 116    The township defendants argue that section 15-86 is facially unconstitutional in that it creates an exemption unauthorized by article IX, section 6, of the Illinois Constitution (Ill. Const. 1970, art. IX, § 6). See *Chicago Bar Ass'n v. Department of Revenue*, 163 Ill. 2d 290, 297 (1994). Plaintiff agrees that, if indeed section 15-86 is facially unconstitutional, as the township defendants contend, the trial court should have denied rather than granted its motion for a summary judgment on count II. (Again, count II sought a declaratory judgment that section 15-86 applied to counts III to XXXIV, which sought exemptions for the four parcels for the assessment years 2004 to 2011.) An unconstitutional statute is unenforceable from the moment of its enactment (*People v. Blair*, 2013 IL 114122, ¶ 30), and if section 15-86 were unconstitutional and hence unenforceable, it could not apply, indirectly or otherwise, to the question of whether the four parcels should be exempt from taxation.

¶ 117    We do not see how we can avoid assessing the constitutionality of section 15-86. See *In re Haley D.*, 2011 IL 110886, ¶ 54. We cannot say that section 15-86 is inapplicable to counts III to XXXIV for any nonconstitutional reason (we already have explored that possibility in our discussion thus far). Standing squarely before us, blocking the hallway, is the question of whether section 15-86 violates article IX, section 6, of the Illinois Constitution. So far as we can see, the question cannot be sidestepped.

¶ 118                                    2. *An Introduction to Article IX, Section 6*
¶ 119    Article IX, section 6, of the Illinois Constitution of 1970 provides as follows:
         "The General Assembly by law may exempt from taxation only the property of the State, units of local government and school districts and property used exclusively for agricultural and horticultural societies, and for school, religious, cemetery and

charitable purposes. The General Assembly by law may grant homestead exemptions or rent credits." Ill. Const. 1970, art. IX, § 6.

¶ 120   In this appeal, we are concerned with the first sentence of article IX, section 6. We make three observations about that sentence.

¶ 121   First, it is not self-executing. If there is to be any exemption from property taxes, the General Assembly must so provide by statutory law–consistently, though, with article IX, section 6. *City of Chicago v. Illinois Department of Revenue*, 147 Ill. 2d 484, 492 (1992). If the General Assembly chooses to exempt property, it can make the exemption *more restrictive* than the terms and conditions of article IX, section 6, such as by requiring, for a charitable exemption, that the property be owned by an "[i]nstitution[ ] of public charity" (35 ILCS 200/15-65(a) (West 2014)) (article IX, section 6, by contrast, says nothing about the *ownership* of the property used exclusively for charitable purposes), but the General Assembly cannot provide an exemption that *exceeds* the terms and conditions of article IX, section 6. *Provena*, 384 Ill. App. 3d at 741. In other words, the General Assembly may not "broaden or add to the exemptions that section 6 of article IX allows" (*id.*)–a limitation made clear by the adjective "only" in the constitutional text (Ill. Const. 1970, art. IX, § 6).

¶ 122   Second, the only owners of real estate that can be exempt from property taxes on the basis of their identity, regardless of how they use the real estate, are "the State, units of local government[,] and school districts." *Id.* All other exemptions–including exemptions for hospitals–must be based on the "exclusive[ ]" "*use*[ ]" of the real estate for any of the listed purposes, namely, "agricultural and horticultural societies, and for school, religious, cemetery[,] and charitable purposes." (Emphasis added.) *Id.*

¶ 123   Third, for the past 106 years, the supreme court has interpreted "exclusive" use as "primary" use. *Chicago Bar Ass'n v. Department of Revenue*, 163 Ill. 2d 290, 300 (1994); *Children's Development Center, Inc. v. Olson*, 52 Ill. 2d 332, 336 (1972); *Illinois Institute of Technology v. Skinner*, 49 Ill. 2d 59, 65-66 (1971); *MacMurray College v. Wright*, 38 Ill. 2d 272, 278 (1967); *City of Mattoon v. Graham*, 386 Ill. 180, 185 (1944); *People ex rel. Fix v. Trustees of Northwestern College*, 322 Ill. 120, 125 (1926); *First Congregational Church of De Kalb v. Board of Review*, 254 Ill. 220, 224 (1912); *People ex rel. Thompson v. First Congregational Church of Oak Park*, 232 Ill. 158, 164 (1908). (Article IX, section 6, of our present constitution is nearly identical to article IX, section 3, of our previous constitution (Ill. Const. 1870, art. IX, § 3), which provided: "The property of the state, counties, and other municipal corporations, both real and personal, and such other property as may be used *exclusively* for agricultural and horticultural societies, for school, religious, cemetery and charitable purposes, may be exempted from taxation; but such exemption shall be only by general law." (Emphasis added.) Because of this close similarity in language, cases discussing property tax exemptions when the 1870 constitution was in force are equally relevant under the 1970 constitution. *Eden Retirement Center, Inc. v. Department of Revenue*, 213 Ill. 2d 273, 286 (2004).)

¶ 124   It could strike an ordinary reader as counterintuitive that "exclusively," in article IX, section 6, means "primarily." After all, "[t]he meaning of a constitutional provision depends on the common understanding of the citizens who, by ratifying the constitution, gave it life. [Citations.] This understanding is best determined by referring to the common meaning of the words used. [Citations.]" *Committee for Educational Rights v. Edgar*, 174 Ill. 2d 1, 13 (1996). "Exclusively" is commonly understood to mean "solely," whereas "primarily" is commonly

understood to mean "mostly." The meanings of these two words might seem, strictly speaking, incompatible.

¶ 125    Taking a hard line, though, on the meaning of "exclusively" would cause any nonexempt use of the property, however trivial and fleeting, to disqualify the property from an exemption–because "exclusively," if one wanted to be strict and pedantic, means 100%, not 99.99%. To the supreme court, it seemed implausible that the ratifiers intended such a draconian, unforgiving standard. It seemed implausible that they intended a church, for example, to lose its exemption, as property used exclusively for religious purposes, merely because the elders held a business meeting there or because a sexton lived in the furnace room. *First Congregational Church of Oak Park*, 232 Ill. at 164. (Since *First Congregational Church of Oak Park*, the supreme court has taken a more expansive view of what constitutes use for an exempt purpose. *McKenzie v. Johnson*, 98 Ill. 2d 87, 98-99 (1983).) If "exclusively" meant "solely," in the absolute sense of 100%, a church would have to forfeit its exemption if one night it hosted a chamber music concert. Likewise, a hospital that provided nothing but charity care would have to forfeit its exemption if it allowed a vending machine on the premises or if it allowed a nurse, during lunch break, to sell Little League popcorn to fellow employees. So, in a spirit of reasonableness, the supreme court somewhat softened the standard to "primary" use.

¶ 126    This standard of "primary" use might seem to suggest that if a building were used 51% of the time for religious purposes and the remaining 49% of the time as a nightclub, it would qualify for an exemption. But that apparently is not what the supreme court means. The nonexempt use has to be "merely incidental" (*Skinner*, 49 Ill. 2d at 66); that is, it cannot be a "major" use. The New Oxford American Dictionary 859 (2001) (definition of "incidental"); see *Streeterville Corp. v. Department of Revenue*, 186 Ill. 2d 534, 536-37 (1999) ("In the instant case, Streeterville concedes that the 26% nonexempt use of the parking facility cannot qualify as merely incidental."). Any nonexempt use has to be trivial or *de minimis*; a reasonable reader would have to give at least that much rigor to the constitutional phrase "used *exclusively* for [exempt] purposes." (Emphasis added.) Ill. Const. 1970, art. IX, § 6.

¶ 127                    3. *The Township Defendants' Argument That*
                    *Section 15-86 Is Facially Unconstitutional in That*
                    *It Bestows a Charitable Exemption Without Requiring*
                    *an Exclusively Charitable Use of the Property*

¶ 128    The township defendants argue that section 15-86 is unconstitutional in that it "authorizes property tax exemption for hospitals without regard to whether a hospital meets the requirement for a charitable exemption under the Illinois Constitution of 1970, article IX, section 6." *Id.*

¶ 129    For two reasons, plaintiff disagrees with the township defendant's argument.

¶ 130    First, plaintiff argues that section 15-86 should be construed to condition the exemption on satisfying the constitutional requirement of exclusive charitable use. See *id.* ("property used exclusively for *** charitable purposes").

¶ 131    Second, plaintiff argues that, regardless of whether section 15-86 is construed to require exclusive charitable use within the meaning of article IX, section 6, the township defendants are unable to prove that there is no set of circumstances in which an exemption pursuant to section 15-86 would be constitutional.

¶ 132    By addressing these two counterarguments by plaintiff, we effectively would address the township defendants' argument. So, let us consider plaintiff's counterarguments, taking them one at a time.

¶ 133                    a. Construing Section 15-86 So as To Make It Constitutional,
                    Insomuch as Such a Construction Would Be Reasonably Defensible

¶ 134    In our *de novo* review of the constitutionality of section 15-86 (see *People v. Boeckmann*, 238 Ill. 2d 1, 7 (2010)), we begin with the presumption that the statute is constitutional, a presumption the township defendants have the burden of clearly rebutting (see *id.* at 6). If the text of section 15-86 is susceptible to two interpretations, both reasonable, one of which would make section 15-86 constitutional and the other of which would make it unconstitutional, we should choose the interpretation that would make it constitutional (thus the township defendants' burden of clearly showing the unconstitutionality). See *id.*

¶ 135    This rule of construction is not a license to rewrite section 15-86; our interpretation should have an objective basis in the statutory text. See *People v. One 1998 GMC*, 2011 IL 110236, ¶ 13. We should "construe [the] statute in a manner upholding its constitutionality *if reasonably possible.*" (Emphasis added.) *Boeckmann*, 238 Ill. 2d at 6.

¶ 136    According to plaintiff, "[s]ection 15-86 should be interpreted, consistent with prevailing case law, to provide a description or illustration of properties owned by not-for-profit hospital-related entities that may be entitled to exemption, but issuance of an exemption remains subject to compliance with the charitable use requirement." The "prevailing case law" that plaintiff has in mind is *Chicago Bar Ass'n* and *McKenzie*. Unlike section 15-86, however, the statutes at issue in those cases actually stated the constitutional requirement of exclusive use and then listed examples of properties that, when so used, would be exempt. See *Chicago Bar Ass'n*, 163 Ill. 2d at 299-300; *McKenzie*, 98 Ill. 2d at 96.

¶ 137    The statute at issue in *Chicago Bar Ass'n* was section 19.1 of the Revenue Act of 1939 (Ill. Rev. Stat. 1991, ch. 120, ¶ 500.1). *Chicago Bar Ass'n*, 163 Ill. 2d at 293-94. It exempted "any other real property used by such schools exclusively for school purposes, *** including, but not limited to" several examples, among which was "property *** on or adjacent to *** the grounds of a school which property is used by [a] *** professional society *** which serves the advancement of learning." Ill. Rev. Stat. 1991, ch. 120, ¶ 500.1. Evidently confused by the convolutions of section 19.1, which resembled a wadded-up fishing line, the circuit court in *Chicago Bar Ass'n* interpreted the "adjacent" property of the "professional society" as something *in addition to and other than* the "real property used by such schools exclusively for school purposes" (*id.*). *Chicago Bar Ass'n*, 163 Ill. 2d at 298. But the supreme court concluded that the text of section 19.1 was reasonably susceptible to an alternative interpretation, which was the preferable interpretation because it made section 19.1 constitutional. Under this alternative interpretation, the "adjacent" property was an example or illustration of "real property used by such schools exclusively for school purposes" (Ill. Rev. Stat. 1991, ch. 120, ¶ 500.1). *Chicago Bar Ass'n*, 163 Ill. 2d at 299-300.

¶ 138    Similarly, in *McKenzie*, the statute established an exemption for " 'property used exclusively for religious purposes,' " and then, in an " 'including' " clause, it listed examples of " 'such property.' " *McKenzie*, 98 Ill. 2d at 94 (quoting Ill. Rev. Stat. 1981, ch. 120, ¶ 500.2). The statute was section 19.2 of the Revenue Act of 1939, and to quote it more fully, it exempted from taxation " '[a]ll property used exclusively for religious purposes *** and not

- 20 -

leased or otherwise used with a view to profit, including all such property owned by churches or religious institutions or denominations and used in conjunction therewith as parsonages.' " *Id.* (quoting Ill. Rev. Stat. 1981, ch. 120, ¶ 500.2). This statutory exemption of " 'parsonages' " was constitutional because (1) " 'parsonages' " were linked to the explicitly stated exempt use by an "including" clause and (2) " 'parsonages' " were " 'such property,' " that is, " 'property used exclusively for religious purposes.' " *Id.* (quoting Ill. Rev. Stat. 1981, ch. 120, ¶ 500.2).

¶ 139    Because section 15-86, by contrast, lacks any mention of exclusive use for an exempt purpose, we do not see how it is comparable to the statutes in *Chicago Bar Ass'n* and *McKenzie*. The statute at issue in *Chicago Bar Ass'n*, section 19.1 of the Revenue Act of 1939 (Ill. Rev. Stat. 1991, ch. 120, ¶ 500.1), exempted "any other real property *used by such schools exclusively for school purposes*, *** including, but not limited to *** property *** on or adjacent to *** the grounds of a school which property is used by [a] *** professional society *** which serves the advancement of learning." (Emphasis added.) *Cf.* Ill. Const. 1970, art. IX, § 6 ("property used exclusively for *** school *** purposes"). In like manner, the statute at issue in *McKenzie*, section 19.2 of the Revenue Act of 1939 (Ill. Rev. Stat. 1981, ch. 120, ¶ 500.2), exempted " 'property used exclusively for religious purposes ***, including all such property owned by churches *** and used in conjunction therewith as parsonages.' " *McKenzie*, 98 Ill. 2d at 94 (quoting Ill. Rev. Stat. 1981, ch. 120, ¶ 500.2). *Cf.* Ill. Const. 1970, art. IX, § 6 ("property *** used exclusively for *** religious *** purposes").

¶ 140    Section 15-86 is quite different. It omits the constitutional standard, and we should not effectively rewrite the statute so as to express what simply is not there. See *One 1998 GMC*, 2011 IL 110236, ¶ 13. Nowhere does section 15-86 say, as a condition of the charitable exemption, that the property must be "used exclusively for *** charitable purposes." Ill. Const. 1970, art. IX, § 6. Instead, section 15-86 bestows a charitable exemption if, during the hospital entity's fiscal year ending in the year for which it seeks an exemption, the value of the "[s]ervices" in subsection (e) (35 ILCS 200/15-86(e) (West 2014)) that the hospital entity provided equals or exceeds the hospital entity's estimated property tax liability for the year for which it seeks an exemption. 35 ILCS 200/15-86(c) (West 2014).

¶ 141    This statutory standard for a charitable exemption conflicts with article IX, section 6, of our constitution. Rather than require the hospital entity to use the subject property exclusively for charitable purposes (nowhere in section 15-86 is the phrase "used exclusively for charitable purposes" to be found), section 15-86 merely requires the hospital entity to, in a manner of speaking, pay for its property tax exemption with certain services of equivalent value. *Id.* The legislature thereby added a new exemption to those authorized by article IX, section 6: a charitable exemption for hospital entities that, regardless of whether they use the property exclusively for charitable purposes, provide just enough "[s]ervices that address the health care needs of low-income or underserved individuals" to economically counterbalance the property tax exemption (35 ILCS 200/15-86(e) (West 2014)). See *Provena*, 384 Ill. App. 3d at 741 ("[T]he General Assembly may not broaden or add to the exemptions that section 6 of article IX allows.").

¶ 142    Not only does section 15-86 settle for something less than exclusive use of the property for charitable purposes; it does not require any charitable use of the property at all. Under section 15-86, a hospital entity can obtain a charitable exemption simply by paying subsidies to community clinics, for example (35 ILCS 200/15-86(e)(2) (West 2014)), or by paying subsidies to the state or local government (35 ILCS 200/15-86(e)(3) (West 2014)). But article

IX, section 6, of the constitution requires exclusive use of the property itself for charitable purposes. Ill. Const. 1970, art. IX, § 6. A property owner cannot buy a charitable exemption. " 'The use to which the property is devoted is decisive rather than the use to which income derived from the property is employed.' " *Provena*, 384 Ill. App. 3d at 764 (quoting *City of Lawrenceville v. Maxwell*, 6 Ill. 2d 42, 49 (1955)). " '[P]roperty which is used to produce income to be used exclusively for charitable purposes may not be exempted from taxation, the test being, instead, the present use of the property rather than the ultimate use of the proceeds derived from the property sought to be exempted.' " *Provena*, 384 Ill. App. 3d at 764 (quoting *People ex rel. Goodman v. University of Illinois Foundation*, 388 Ill. 363, 374 (1944)).

¶ 143                                     b. The No-Set-of-Circumstances Test

¶ 144    A party challenging the constitutionality of a statute can contend either that the statute is unconstitutional on its face or that the statute is unconstitutional as applied to the particular context in which the party acted or proposed to act. *Lamar Whiteco Outdoor Corp. v. City of West Chicago*, 355 Ill. App. 3d 352, 365 (2005). The township defendants challenge the facial constitutionality of section 15-86.

¶ 145    Our supreme court has said this about facial unconstitutionality:

> "It is especially difficult to successfully mount a facial challenge to a statute. The fact that a statute may operate invalidly under some circumstances is insufficient to establish facial invalidity; a statute is facially unconstitutional only if ' "*no* set of circumstances exists under which the Act would be valid." ' (Emphasis added.) *In re C.E.*, 161 Ill. 2d 200, 210-11 (1994), quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987). Thus, so long as there exists a situation in which a statute could be validly applied, a facial challenge must fail." *Hill v. Cowan*, 202 Ill. 2d 151, 157 (2002).

¶ 146    The no-set-of-circumstances test seems problematic to us for three reasons, which we will discuss under the following headings.

¶ 147                          (1) *The Supreme Court of the United States*
                              *Apparently Has Never Used the Test,*
                              *and in Fact Has Backpedaled From It*

¶ 148    *Hill* poses the question of whether any "set of circumstances *exists* under which the Act would be valid" or whether "there *exists* a situation in which [the] statute could be validly applied." (Emphases added and internal quotation marks omitted.) *Id.* And yet surely, when a party contends that a statute is unconstitutional on its face, *Hill* does not expect the court to perform an extrajudicial investigation to find out if some alternative set of circumstances empirically "exists." *Id.* Rather, *Hill* must mean "hypothetically exists": the court should try to hypothesize an alternative set of circumstances, or imagine a different "situation," in which the statute would be constitutionally valid. *Id.*

¶ 149    One problem with this speculative approach is that the originator of the no-set-of-circumstances test, the Supreme Court of the United States (see *United States v. Salerno*, 481 U.S. 739, 745 (1987)), has more recently stated: "In determining whether a law is facially invalid, we must be careful not to go beyond the statute's facial requirements and speculate about 'hypothetical' or 'imaginary' cases." *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449-50 (2008). This seems another way of saying that

when determining whether a statute is facially unconstitutional, we must be careful *not* to apply the no-set-of-circumstances test. See *City of Chicago v. Morales*, 527 U.S. 41, 55 n.22 (1999) (plurality opinion noting that "[t]o the extent we have consistently articulated a clear standard for facial challenges, it is not the *Salerno* formulation, which has never been the decisive factor in any decision of this Court, including *Salerno* itself"); *Doe v. City of Albuquerque*, 667 F.3d 1111, 1125 n.8 (10th Cir. 2012) (giving examples of cases in which the Supreme Court assessed the facial constitutionality of a statute and in which the no-set-of-circumstances test would have led to the opposite result, had the Supreme Court applied that test); *Sonnier v. Crain*, 613 F.3d 436, 463-64 (5th Cir. 2010) (Dennis, J., concurring in part and dissenting in part) (arguing that the no-set-of-circumstances language in *Salerno* is "nothing more than a controversial dictum" and stating that "diligent research" has failed to reveal "a single Supreme Court case–including *Salerno* itself–in which the holding actually relied on the 'no set of circumstances' test").

¶ 150                    (2) *It Is Unclear What the Phrase "Validly Applied" Means*

¶ 151     *Hill* says a statute is facially unconstitutional only if no circumstances could be hypothesized in which the statute "would be valid" or "could be validly applied." (Internal quotation marks omitted.) *Hill*, 202 Ill. 2d at 157. We are unclear what the phrase "validly applied" means in this context.

¶ 152     To explain our uncertainty, we invite the reader to assume the existence of an Illinois statute that provides: "A charitable exemption shall be granted to every parcel of real estate that has an odd-numbered street address." Pursuant to the no-set-of-circumstances test, we can easily hypothesize that, somewhere in Illinois, there exists a parcel of real estate used exclusively for charitable purposes–a food bank, for instance–that has an odd-numbered street address. Could the statute be "validly applied" to this hypothetical food bank? *Id.*

¶ 153     Well, yes and no. It depends on what you mean by "validly applied." More precisely, it depends on what part of the statute you are applying. The part of the statute reading "[a] charitable exemption shall be granted" could be validly (constitutionally) applied to the food bank, because the food bank is used exclusively for charitable purposes, in satisfaction of article IX, section 6 (Ill. Const. 1970, art. IX, § 6). But the part of the statute basing the exemption on having "an odd-numbered street address" could not be validly applied to any parcel, no matter what the circumstances, because granting an exemption merely on the basis of having an odd-numbered street address, without regard to exclusive use for charitable purposes, violates article IX, section 6.

¶ 154     This illustration we have come up with might at first seem far-fetched, but actually, as far as article IX, section 6, is concerned, providing charitable services equivalent in value to the estimated property tax liability is just as irrelevant as having an odd-numbered street address. When it comes to the charitable exemption, all article IX, section 6, cares about is whether the property is "used exclusively for *** charitable purposes." *Id*. Article IX, section 6, on its face, is completely indifferent to whether this exclusively charitable use makes the exemption financially worthwhile for the government, just as it is completely indifferent to whether the property has an odd-numbered street address.

¶ 155     If the legislature wished, it could provide that *even though* property is used exclusively for charitable purposes, the property shall be exempt from taxation only if, additionally, the value of the charitable services equals or exceeds the estimated property tax liability–because, again,

- 23 -

the legislature is free to make the terms of an exemption more restrictive than the terms in article IX, section 6 (*Provena*, 384 Ill. App. 3d at 741). But the legislature lacks the constitutional authority to provide that, *regardless of whether* the property is used exclusively for charitable purposes, the property shall receive an exemption if the value of the charitable services equals or exceeds the estimated property tax liability–because that would be adding to or broadening the exemption in article IX, section 6 (see *id.*).

¶ 156    Such, though, is the import of section 15-86. "[A] constitutional defect inheres in the terms of the statute itself, independent of the statute's application to particular cases." *One 1998 GMC*, 2011 IL 110236, ¶ 86 (Karmeier, J., specially concurring). "[T]he omission of a provision which constitutional principles require," namely, use exclusively for charitable purposes, "is an inherent and inescapable flaw" in section 15-86 "which renders the [statute] invalid no matter what the circumstances." *Id.* ¶ 87.

¶ 157                    (3) *The No-Set-of-Circumstances Test Turns the Discussion*
*Away From the Statutory Text, Whereas, Seemingly,*
*When the Facial Constitutionality of a Statute Is Challenged,*
*the Discussion Should Be All About the Statutory Text*

¶ 158    One of the drawbacks of the no-set-of-circumstances test is that it "completely divorces review of the constitutionality of a statute from the terms of the statute itself, and instead improperly requires a court to engage in hypothetical musings about potentially valid *applications* of the statute." (Emphasis in original.) *Doe*, 667 F.3d at 1123. The discussion gets diverted to the subject of the hypothetical food bank (to return to our illustration) when the discussion should be about the undeniably unconstitutional statutory provision that would award a charitable exemption merely on the basis of having an odd-numbered street address (or merely on the basis of equaling or exceeding the estimated property tax liability).

¶ 159    Even so, our supreme court, in conformance with *Salerno*, has prescribed the no-set-of-circumstances test for facial challenges to the constitutionality of statutes (*One 1998 GMC*, 2011 IL 110236, ¶ 20), and therefore our duty, as an inferior court, is to apply the no-set-of-circumstances test to determine whether a statute is facially unconstitutional–even though we have difficulty making sense of the test so as to even be able to apply it. But we will do our best.

¶ 160    The crucial provision in section 15-86 is the first sentence of subsection (c): "A hospital applicant satisfies the conditions for an exemption under this Section with respect to the subject property, and shall be issued a charitable exemption for that property, if the value of services or activities listed in subsection (e) [(35 ILCS 200/15-86(e) (West 2014))] for the hospital year equals or exceeds the relevant hospital entity's estimated property tax liability, as determined under subsection (g) [(35 ILCS 200/15-86(g) (West 2014))], for the year for which exemption is sought." 35 ILCS 200/15-86(c) (West 2014). We can imagine a hospital applicant that, during the hospital year, provided services and activities listed in subsection (e) that equaled or exceeded its estimated property tax liability and that *also* used its subject property exclusively for charitable purposes (although section 15-86, by its terms, does not require such exclusively charitable use as a condition of the charitable exemption). "[C]ould" section 15-86

"be validly applied" to this hypothetical hospital applicant? *Hill*, 202 Ill. 2d at 157. Again, it depends on what you mean by "validly applied."

¶ 161 If you understand "validly applied" in a result-oriented way, yes, section 15-86 could be validly applied to our hypothetical hospital applicant, because this applicant uses the subject property exclusively for charitable purposes and because article IX, section 6, of the Illinois Constitution (Ill. Const. 1970, art. IX, § 6) allows the legislature to grant a charitable exemption for property used exclusively for charitable purposes.

¶ 162 By this reasoning, though, the legislature could have passed a statute providing simply that "every hospital applicant shall be granted a charitable exemption," and because it would be possible to hypothesize at least one hospital applicant that used its property exclusively for charitable purposes, a challenge to the facial constitutionality of the statute likewise would fail. But denying the facial unconstitutionality of such a statute would be absurd. The result-oriented approach cannot be right.

¶ 163 It would make more sense to say that an unconstitutional criterion cannot be "validly applied" to *any* hospital applicant and that by disregarding the unconstitutional criterion, we would effectively be deleting an essential part of the statute instead of taking the statute as it is. *Hill*, 202 Ill. 2d at 157. A statute granting a charitable exemption to all hospital applicants cannot be "validly applied" even to a hospital applicant that uses its property exclusively for charitable purposes, because the statute grants an exemption on the basis of an unconstitutional criterion: being a hospital applicant. A "law" purporting to grant a charitable exemption has to contain the criterion that article IX, section 6, requires: "use[ ] exclusively for *** charitable purposes." Ill. Const. 1970, art. IX, § 6.

¶ 164 Measured against the terms of article IX, section 6 (*id.*), section 15-86 is unconstitutional on its face because it purports to grant a charitable exemption on the basis of an unconstitutional criterion, *i.e.*, providing services or subsidies equal in value to the estimated property tax liability (35 ILCS 200/15-86(c) (West 2014)), without requiring that the subject property be "used exclusively *** for charitable purposes." Therefore, the trial court should have denied plaintiff's motion for summary judgment on count II, which sought a declaratory judgment that section 15-86 applied to the determination of whether the four parcels were exempt for the assessment years 2004 to 2011. Because section 15-86 was unconstitutional, it was unenforceable from its inception. See *People v. Blair*, 2013 IL 114122, ¶ 30.

¶ 165                                    III. CONCLUSION

¶ 166 For the foregoing reasons, we reverse the trial court's judgment, and we remand this case for further proceedings.

¶ 167 Reversed and remanded.